**Robert A. KOLB, Jr., Plaintiff-Appellant,**

v.

**CHRYSLER CORPORATION et al., Defendants-Appellees.**

No. 80–1984.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 20, 1981.

Decided Oct. 15, 1981.

Robert F. Wood, Rochester, N. Y., for plaintiff-appellant.

Peter J. Stone, Whyte & Hirschboeck, S. C., Milwaukee, Wis., for defendants-appellees.

Before CUMMINGS, Chief Judge, KUNZIG, Judge,[*] and CUDAHY, Circuit Judge.

KUNZIG, Judge.

This is an action by plaintiff-appellant Kolb arising out of his participation in a car dealership under defendant-appellee Chrysler's "Dealer Enterprise" (D.E.) program. A jury verdict in favor of Kolb was set aside by the district judge upon a motion for judgment notwithstanding the verdict (J.N.O.V.). We now partially reject and partially sustain Kolb's appeal from that decision.

On or about February 24, 1969, Chrysler and Kolb—the latter a Chrysler District Manager—together established a car dealership in Wisconsin named "Waukesha Chrysler-Plymouth (Corporation), Inc." Kolb contributed $30,000 in exchange for 100 percent of the common stock of the Corporation and Chrysler contributed $90,-000 in exchange for 100 percent of the preferred stock. Only the preferred stock had voting power. Plaintiff and two officers of Chrysler became the directors of the Corporation, plaintiff also serving as president and general manager.

The parties further executed a written stock agreement. Pursuant to this agreement, Kolb was required gradually to purchase the outstanding preferred stock of the Corporation from Chrysler utilizing bonuses paid to him by the Corporation. Immediately after each purchase, Kolb was to exchange the preferred for additional common stock of the Corporation, thereby preserving Chrysler's exclusive voting power so long as the preferred stock was outstanding. The agreement also contained a common stock buy-out provision to apply in the event of Kolb's departure from the business.

Finally, Chrysler entered into a direct dealer agreement with the Corporation, granting it a franchise to market Chrysler passenger cars, parts and accessories. Kolb signed this contract on behalf of the Corporation.[1]

Kolb's management proved unsuccessful. The dealership lost approximately $30,000 in 1969 and an additional $60,000 during the first half of 1970. In July 1970, Chrysler obtained Kolb's resignation as an officer and director. It later bought out his stock for nominal consideration and sold the assets of the Corporation to a private capital dealer. The business thereafter prospered. Kolb, however, suffered a complete loss of his investment in the project.

On June 29, 1971, Kolb filed this lawsuit, alleging numerous federal and state claims. Most of the claims were dismissed upon defendant's motion for summary judgment in a comprehensive decision by District

---

[*] The Honorable Robert L. Kunzig, Judge of the United States Court of Claims, is sitting by designation.

[1] The alternative marketing device which Chrysler has employed is that of the private capital dealer. In this arrangement, Chrysler does not own any part of the dealership, but simply enters into a franchise contract with it. *See Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 75 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978).

Judge Robert W. Warren. *Kolb v. Chrysler Corp.*, No. 71–C–326 (E.D.Wis. Sept. 30, 1977)[2] At trial, District Judge Terence T. Evans, presiding, only four counts remained.

The first two counts concerned alleged violations of federal and state Dealer Acts. The Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221–1225 (1976), gives an automobile dealer the right to recover damages caused by the failure of an automobile manufacturer to act in "good faith" in performing the terms of the franchise agreement or in terminating or not renewing the dealer's franchise. § 1222. The Act defines "good faith" as follows:

> The term "good faith" shall mean the duty of each party to any franchise . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

§ 1221(e). *See, e. g., Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901 (9th Cir.), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978); *Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.*, 461 F.2d 608 (7th Cir.), *cert. denied*, 409 U.S. 981, 93 S.Ct. 317, 34 L.Ed.2d 245 (1972). The Wisconsin Dealer Act provides a private remedy to dealers if a manufacturer has "unfairly, without due regard to the equities of said dealer and without just provocation, canceled the franchise of any motor vehicle dealer," or "induced or coerced . . . any motor vehicle dealer to accept delivery of any motor vehicle or vehicles, parts or accessories therefor, or any other commodities which shall not have been ordered . . . ." Wis.Stat.Ann. § 218.-01(3)(a) 15, 17 and (9) (1980–1981 Supp. West). "The purpose of the law is to furnish the dealer with some protection against unfair treatment by the manufac-turer." *Forest Home Dodge, Inc. v. Karns*, 29 Wis.2d 78, 85, 138 N.W.2d 214, 218 (1965).

The two remaining counts were for breach of contract and fraud. The breach claim was premised upon the following provision of the stock agreement:

> As soon as practical after the initial twelve (12) months of Manager's [i. e., Kolb's] operation, the Corporation's [i. e., dealership's] auditors shall determine if the Corporation has sustained a net operating loss during and for such period, and shall advise the Board of Directors of the Corporation the amount of any such loss. Thereupon the Board of Directors shall notify Chrysler and Manager of the amount of such loss. Upon receipt of such notice, Chrysler and Manager shall determine if additional capital is required to maintain the capital of the Corporation at a satisfactory level, and, if so, the amount of additional capital that shall be required. Chrysler and Manager shall each contribute to the capital of the Corporation in cash, a proportionate share of such additional capital.

Kolb complained that Chrysler failed to perform the twelve-month audit and to contribute additional capital to offset the first year losses.

The court submitted the case to the jury upon a special verdict with written questions. The jury's responses were not entirely favorable to either side. The jury found: 1) violation of the federal Dealer Act, damages of $135,000; 2) violation of the state Dealer Act, no damages; 3) breach of the written stock agreement, damages of $30,-000; 4) no fraud. Both parties then moved for judgment notwithstanding the verdict under Fed.R.Civ.P. 50. Kolb requested that the verdict be set aside insofar as the jury found no damages under the state Dealer Act and no fraud. Chrysler sought a determination that it had not violated the Dealer Acts, federal or state, and had no liability under the stock agreement. Chrysler's motion was granted, Kolb's denied. Kolb's action was dismissed. *Kolb v. Chrysler*

---

2. Kolb has filed a notice of appeal from that decision but has submitted no briefing thereon. We have reviewed the decision, however, and believe it to be sound.

*Corp.*, No. 71–C–326 (E.D.Wis. June 24, 1980).

With regard to the purported Dealer Act violations, the court said: "The verdict of the jury that Chrysler violated both the federal and the state laws cannot be sustained. No evidence in the record shows that Chrysler acted without just provocation, and certainly nothing Chrysler did can be termed coercion under either law." *Id.* at 4. Further, "Even if the jury findings on liability were permitted to stand, the record in this case in no way supports a damage award of $135,000 to Kolb personally. Kolb's only loss which is documented in the evidence is the $30,000 of his original investment." *Id.* at 6.

On the breach count, the court's opinion reads as follows:

> The court also finds that the evidence in this case does not allow a finding of anything but a technical breach of the stock agreement. The agreement provided that at the end of twelve months of operation, an audit would be made of the amount of the capital impairment; then the parties would decide on any additional capital contribution. However . . . neither party was obliged to make further contributions. It is true that no audit was made of the first twelve months of operation, however, an audit was made of the first ten months of operation. That audit was not completed until the 13th month of operation. To say that another audit should have commenced after the 12th month would be to require the absurd. Furthermore, it was clear, audit or no audit, that the business was losing money. No formal audit was necessary to confirm the obvious.

*Id.* at 6–7. The court upheld without comment the jury's finding of no fraud. This appeal followed. Kolb seeks reversal of both aspects of the lower court decision: the grant of J.N.O.V. in favor of Chrysler, and the denial of Kolb's own motion therefor.

It is well settled that if the trial court erroneously grants judgment notwithstanding the verdict, the appellate court may reverse and order reinstatement of the verdict of the jury. Similarly, if the motion for judgment is erroneously denied, the appellate court has power to order the entry of judgment for the moving party. Wright and Miller, Federal Practice and Procedure: Civil § 2540 (1971).

■ The standard of appellate review of a J.N.O.V. order is the same as that applied by the district court under Rule 50: the motion should be denied where the evidence, along with all inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions. *Compare Farmers State Bank v. Dravo Corp.*, 321 F.2d 38, 39 (7th Cir. 1963) *with Funk v. Franklin Life Insurance Co.*, 392 F.2d 913, 915 (7th Cir. 1968). Bearing this standard in mind, the court concludes that the district court decided Kolb's motion for J.N.O.V. in the proper manner but partially erred with respect to Chrysler's own motion therefor.

■ The lower court found Kolb's fraud and Dealer Act claims to be wholly without foundation. We agree. The record shows that Chrysler dealt firmly, but fairly with Kolb and obtained the latter's resignation out of legitimate concern for the survival of the business and the protection of its own sizable investment: $90,000, or three-fourths of the total capitalization. We find nothing suggesting coercion, intimidation, bad faith, fraud or any sort of unfairness.

The matter of the stock agreement involves two separate considerations.

■ First, the lower court interpreted the agreement as imposing upon Chrysler the obligation to perform an audit of the Corporation following the initial twelve months of operation, an obligation which Chrysler never fulfilled. The court found, however, that it would be "absurd" to say that an audit should have been performed, since an audit had been made of the first ten months of operation, that audit was not completed until the thirteenth month, and

"it was clear, audit or no audit, that the business was losing money." Thus, the failure to perform the twelve-month audit was merely a "technical breach." The court held, in effect, that while there had not been perfect compliance with the contractual requirement, the breach was harmless under the circumstances, and, therefore, could not ground a claim for damages. This analysis was proper.

Second, there is Chrysler's failure to contribute additional capital following the expiration of twelve months of operation, an omission which Kolb deems actionable. The crucial language in the stock agreement is as follows:

> Chrysler and Manager [*i. e.*, Kolb] shall determine if additional capital is required to maintain the capital at a satisfactory level, and, if so, the amount . . . required. Chrysler and Manager shall each contribute to . . . the Corporation . . . a proportionate share of such additional capital.

The district judge held that, "[N]either party was obliged to make further contributions."

My two brethren on this panel, Chief Judge Cummings and Judge Cudahy, have decided that the district judge should be reversed on this aspect of the case. For the reasons set forth in my partial dissent, *post*, I respectfully disagree with that decision. The reasoning supporting the majority's reversal on this point is set forth, *post*, in Judge Cudahy's concurring opinion.

Accordingly, after consideration of the record and the submissions of the parties, with oral argument of counsel, the judgment of dismissal is affirmed in part and reversed in part. Plaintiff is entitled to recover $30,000.00 and judgment is herein entered for that amount.

1. The record indicates that Chrysler's Dealer Enterprise division was absorbed by its Marketing Investment Division ("MID") in 1967.

2. For example, a forecast prepared by MID in 1968 estimated that the Waukesha dealership that Kolb ultimately opened would lose approximately $45,000 in its first year of operation.

3. Kolb testified as follows:
   [A]s Mr. Woker said, that there may be some lean months in the Waukesha market and

CUDAHY, Circuit Judge, concurring, with whom CUMMINGS, Chief Judge, joins:

The "crucial language" of the Stock Agreement is set forth in Judge Kunzig's opinion, *supra* at 1141. This language, which is part of Article III of Chrysler's standard Stock Agreement, provided for recapitalization of the Corporation after its first twelve months of operation. According to the testimony of George Moore, a former area manager for Chrysler's Marketing Investment Division,[1] Article III was added to the Stock Agreement in 1965 to provide protection for the many dealer enterprise dealerships that lost money in their first year of operation. This protection apparently played an important role in dealer enterprise arrangements, because, according to the testimony of Edward Bond, head of MID during Kolb's tenure, Chrysler operated on the assumption that new dealerships would "function at a loss for a period of time due to the fact that you probably had not been represented in the market or you may have had poor representation. . . . And in a new market it might take some time to arrive at the potential of the market due to the missionary work. Due to the missionary work you would have to do, it wasn't always possible to become profitable in the first one, two or perhaps three years."[2] Kolb testified that he was informed of the recapitalization feature of Article III by Garmon Woker, Area Manager of Chrysler's Sales Division, and that he relied on it "very, very strongly" in deciding whether to establish a dealer enterprise dealership.[3]

Under the terms of Article III, Chrysler was required to (1) conduct an audit to

that Chrysler Corporation has got a lot more money than you have and that by going through with the DE, in as a DE participant at 25 percent, it would only mean an expenditure of $30,000 as private capital and you say you have $60,000 plus a capital loan.

He says [sic] this way you could go in with $30,000 as an investment. Now, if in the [event] that you encounter for any reason the need for additional capital, there is this participation for, you'll have an opportunity to revitalize the business. This would be your

determine whether and to what extent the Corporation had sustained a net operating loss during the first twelve months of operation, (2) determine, together with Kolb, if additional capital was required "to maintain the capital of the Corporation at a satisfactory level; and, if so, the amount of additional capital that shall be required," and (3) "contribute to the capital of the Corporation in cash, a proportionate share of such additional capital."

The district court determined that Chrysler's breach of its obligation to perform an audit was not material since an audit had been made after the first 10 months of operation and since "it was clear, audit or no audit, that the business was losing money."

Even if this analysis is accepted, it is clear that Chrysler breached its second obligation of determining, together with Kolb, "if additional capital is required to maintain the capital of the Corporation at a satisfactory level." Kolb testified that when, in late February 1970, he spoke with Frank Moran, Chicago Branch Manager of MID, about the 12-month audit required by Article III, Moran told him that he had not made arrangements for the audit and that he felt as though Chrysler would not have money available to recapitalize the dealership. And, when Kolb raised the possibility of recapitalizing the dealership in other conversations with Moran, Moran repeatedly told him that Chrysler had no money to put into the dealership and that he should not raise the issue again.[4] Thus, Chrysler clearly breached its obligation of determining, in good faith,[5] whether additional contributions were necessary to maintain the Corporation's capital at a satisfactory level.[6]

Judge Kunzig, *infra* at 1143, would excuse Chrysler's failure to calculate and provide the amount of money needed to satisfactorily recapitalize the Corporation by stating that "Chrysler's omission to contribute additional capital cannot be deemed a breach because it never came under any absolute duty to do so." In his view, Chrys-

---

safety valve in the event that you did encounter some lean months where recapitalization was needed. This is the safety valve where we can participate at the same proportionate rate so we can restore it to the proper level.
. . . .
The agreement called for recapitalization to restore the working capital to a satisfactory level. Whether it's in those specific words or not, but all I know is when I went into this deal that they assured me if there were going to be some lean months or if there was need for recapitalization or revitalization or recapitalization, or whatever term you want to use, I don't know if all these terms mean exactly the same or not. But I was assured if it needed more money, that they indeed would restore it to the working capital to a satisfactory level. And I relied on that. . . . I relied on that very, very strongly and that was a selling point for me to go DE.

4. Kolb's testimony reads in part as follows:
And I said [in late December 1969], 'Mr. Moran, we have got to have more money in this business.' And he says, 'Kolb, forget it. There's no money.' I says, 'Mr. Moran, we've got to have—I know that the audit is going to come up in the end of February after the first 12 months of operation. But we need it now.' And he says, 'I don't know how many times I got to tell you. There's no money.' So then I'd hang up.
. . . .

[I]n the first week of January I called Mr. Moran, and I again pleaded for an opportunity to contribute capital to this dealership, and he says, and I quote, 'Goddam it, Kolb, how many times do I have to tell you? There's no money. Now I don't want to hear any more about it.' I said, 'Well, I would like maybe to call Mr. Moore. It's this serious. I can see the handwriting on the wall. We've got to have money in this dealership.' And he says, 'You don't call anybody but T. Frank Moran.' And he says, 'Is that understood?' He says, 'If it isn't,' he says, 'there will be some consequences.'

5. In its brief on appeal, Chrysler recognized that "under the Dealer Acts, Chrysler is required to discharge its contractual obligations under [*inter alia*, the Stock Agreement] in good faith." Of course, this duty of good faith performance would also be imposed on Chrysler under settled principles of contract interpretation. *Cf.* U.C.C. § 1–203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement.")

6. Moran's protestations that Chrysler did not have money available to meet its obligation of recapitalizing the dealership were baseless; immediately after Kolb was forced to resign, Chrysler provided approximately $125,000 in additional capital to the Corporation.

ler's obligation to provide additional capital was wholly conditional upon "a joint determination to recapitalize," and since this joint determination never occurred, Chrysler's obligation "never became absolute."

These statements contradict the language of Article III and frustrate its purpose. Chrysler's obligation under Article III was not merely to consider recapitalization, but to *determine*, together with Kolb, if additional capital was required to "maintain the capital at a satisfactory level" and then to "*contribute* in cash a proportionate share of such additional capital." (emphasis supplied). Nothing in Article III permitted Chrysler to decide unilaterally whether it was "desirable" to make the required contribution. Indeed, such an interpretation makes wholly illusory the protection that Article III was intended to provide to new dealerships.

Subsequent provisions of Article III make it clear that the language requiring additional capital contributions was not meant to be merely precatory. Paragraph A(2) provides, for example, that "[i]f for any reason Manager [Kolb] ceases to be President of the Corporation at any time *prior* to the close of the initial twelve (12) months of Manager's operation . . . and Chrysler elects to purchase Manager's Common Stock . . . neither Manager nor Chrysler shall be obligated to make any contribution to the capital of the Corporation. . . ." And, Paragraph B provides that

> [i]f the Corporation shall sustain net operating losses at any time *after* the close of the initial twelve (12) months of Manager's operation . . Chrysler and Manager shall participate in such losses in the following manner: 1. Chrysler and Manager may *voluntarily* contribute to the capital of the Corporation or subscribe to additional Capital Stock in order to maintain

the capital of the Corporation at a satisfactory level; however, neither party shall have any obligation to do so, and any contribution by either party shall be expressly conditioned upon the other party contributing an amount in proportion to the aggregate par value of their respective stock holdings at the time such contributions are to be made. (emphasis added).

Under the circumstances of this case, it may have been improvident of Chrysler to have obligated itself to recapitalize the Corporation at the end of the first twelve months of its operation. But it is not our function to relieve the parties of duties imprudently contracted.[7] We are unable to follow the dubious rationale by which the district court transformed recapitalization from a joint to a unilateral decision. Apparently the jury was equally perplexed by the purported reasons for this contractual sleight-of-hand.

Accordingly, the district court's grant of J.N.O.V. with regard to the contract claim is reversed and remanded with instructions to reinstate the jury verdict on this claim.

KUNZIG, Judge, dissenting in part.

I disagree with the majority's decision concerning the so-called recapitalization obligation. My specific conclusion comports more closely with the specific contractual language which governs the matter.

The stock agreement expressly defines the scope of the recapitalization obligation as follows: "Chrysler and [Kolb] shall each contribute to . . . the Corporation . . . a proportionate share of *such* additional capital." (Emphasis supplied.) The expression "*such* additional capital" plainly refers to the amount which the parties "shall determine . . . [to be] required to maintain the capital at a satisfactory level." In other

---

7. In this regard, it is significant to note that the recapitalization provisions of Article III were perceived as beneficial by Chrysler. According to the testimony of Edward Bond, the recapitalization arrangement permitted Chrysler to undercapitalize dealerships initially (and thereby commit less of its investment capital), with the understanding that, if necessary, additional capital would subsequently be provided to the dealership. Several witnesses testified at trial that the dealership in this case had been initially undercapitalized. Patricia Kluck, Secretary-Treasurer of the Corporation testified, for example, that the dealership should have been initially capitalized at approximately $250,000.

words, Chrysler and Kolb were only required by the agreement to contribute such additional capital as they mutually, after twelve months, determined to be requisite for maintaining the capital at a satisfactory level. Note that the operative terms—"determine," "additional capital," "maintain," "satisfactory level"—are undefined by the stock agreement and bespeak an intention to afford the contracting parties the greatest possible latitude in arriving at their determination. The crucial point, however, is that under any plausible construction of these terms, the requisite determination never occurred and therefore the key event triggering the recapitalization obligation did not transpire. Consequently, Chrysler's omission to contribute additional capital cannot be deemed a breach because it never came under any absolute duty to do so.

Restated, it is my view that the stock agreement did not create an unconditional obligation to recapitalize, but only a conditional obligation. The pivotal condition, a joint determination to recapitalize, had not been satisfied and therefore the obligation never became absolute. *Ergo*, the basis for a breach claim is wholly lacking.

My conclusion, essentially a matter of word-logic, is bolstered by considering the flaws in the position staked out by the majority on this point.

Generally, the majority, *via* Judge Cudahy's concurrence, expounds the viewpoint that the stock agreement did indeed obligate Chrysler to participate in the recapitalization of the Waukesha dealership following the first twelve months of operation. In summing up, Judge Cudahy's concurrence states that Chrysler may have been "improvident" in giving this commitment, but that "it is not our function to relieve the parties of duties imprudently contracted." This statement is revealing, because it explicitly shows that the majority is not averse to interpreting arguably ambiguous contract language in a manner which reflects poorly upon the business judgment of the contracting parties. On the contrary, I believe that as an aid to construction it is far more fruitful to assume that contracting parties act rationally and strive to make reasonable business deals. Given this stance, I prefer my own interpretation to the majority's.

In essence, I would hold that the parties merely adopted a "wait and see" attitude as regards further capitalization after twelve months. It is apparent from the record that nascent car dealerships stand a good chance of losing money during their first year of operation due to the normal vicissitudes of breaking into a new market. Under these circumstances, it was prudent for the parties to have signalled the possible need for additional capitalization at that time and to have established a special audit procedure to guarantee that all the relevant data would be in hand.

The majority, however, goes one important step further. It asserts that the stock agreement did not merely evince a "wait and see" attitude, but positively bound the parties to some additional capitalization following the expiration of twelve months; in other words, that it did *not* give each party the option to veto further recapitalization by simply refusing to give his assent thereto. Reduced to practical terms, this is tantamount to saying that the parties bound themselves to an open-ended commitment to advance an indeterminate amount of dollars to an established money-losing concern without any way of knowing the circumstances which would actually be in existence at the time when the contribution would have to be made. I submit that this is something that a rational investor would not do. Such an open-ended commitment would be foolish and needlessly risky and would expose the obligor to the very likely prospect of having to throw good money after bad. And it is not what I think happened here. I think that, in effect, the parties simply promised each other to keep an open mind and not to be unalterably opposed to further capitalization after one year's experience with the new dealership. Such an exchange of promises is not inherently valueless, as the majority suggests, despite that the fact that it merely creates the hope rather than guaranty of future additional cash infusions.

The majority points to certain verbal assurances which Kolb claims to have received, but I do not believe that these so-called assurances (a term notably vague) in any way go beyond the specific provision of the stock agreement to which they refer. The majority also relies upon certain seeming inconsistencies in the drafting of the stock agreement and attempts to draw therefrom an inference unfavorable to Chrysler. While I grant the general validity of the majority's point, I hardly view it as compelling and do not regard it as sufficient to override the more fundamental point that the majority's analysis leads straight to an unrealistic result.

The majority further asserts that a damages claim can be predicated upon the fact that "Chrysler clearly breached its obligation of determining, in good faith, whether additional contributions were necessary to maintain the Corporation's capital at a satisfactory level." *Ante,* at 1142. Presumably then, some sort of good faith bargaining session was required, an obligation which Chrysler rather plainly ignored, according to the majority.

I wholly disagree. The majority is effectively seeking to read into the relevant portion of the stock agreement a procedural component which simply is not there. Aside from the provision of a twelve-month audit, the agreement is absolutely silent on what steps the parties might have taken in arriving (or not arriving) at their determination.

This case involves a plethora of legal and factual issues and has generated an enormous record. The district judge, having heard all the evidence and assessed the credibility of the witnesses, concluded that Kolb's breach claim was utterly baseless. While this decision does not bind us, in a case such as this, it is entitled to substantial deference. The scattered bits of argumentation upon which the majority relies do not, in my opinion, cast any substantial doubt upon the propriety of the disposition of the district court.

Accordingly, I respectfully dissent with regard to the majority's reversal on the recapitalization claim.