**George N. GOLDMAN,**
**Plaintiff–Counter–Defendant–Appellant,**
**Cross–Appellee,**

**v.**

**Steve C. FADELL, et al.,**
**Defendants–Counter–Plaintiffs–Appellees,**
**Cross–Appellants.**

**Nos. 87–1456, 87–1528.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 4, 1987.

Decided April 4, 1988.

Rehearing Denied May 4, 1988.

Jay A. Canel, Jay A. Canel, P.C., Chicago, Ill., for plaintiff-counter-defendant-appellant, cross-appellee.

Steven W. Handlon, Handlon & Handlon, Portage, Ind., for defendants-counter-plaintiffs-appellees, cross-appellants.

Before COFFEY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This action involves an alleged breach of an exclusive real estate sales listing agreement to sell a mobile home park. The realtor brought this action against the park owners to collect the sales commission stipulated in the listing agreement. In the District Court, the jury rejected the realtor's breach of contract claim. The trial judge upheld this verdict, and denied the realtor's motion for judgment notwithstanding the verdict ("JNOV"). The defendants had filed a counterclaim, alleging that the realtor breached his fiduciary duties to them, and requesting compensatory and punitive damages. The jury awarded the defendants $100,000 in damages on this counterclaim.[1] The trial judge set aside this verdict, and granted the realtor's motion for JNOV on the counterclaim. The realtor appeals the denial of his motion for JNOV on his breach of contract claim. The defendants cross-appeal the District Court's grant of the realtor's motion for JNOV on their counterclaim. We affirm both rulings of the District Court.

I

George N. Goldman, an Illinois citizen, entered into a brokerage agreement with Steve C. Fadell, a citizen of Indiana, to sell a mobile home park located in Portage, Indiana. Fadell's two land development companies owned the park. The agreement, dated February 8, 1982, was an exclusive sales listing agreement whereby Goldman's realty firm, Goldman & Associates, had the exclusive right to sell the park for six months. After this time, the contract remained in effect until either party gave thirty days written notice. If neither party gave notice, the agreement terminated February 8, 1984, two years from the date of the agreement. The contract further stipulated that the property would be sold for $5.9 million, with $1.5 million to be paid in cash. The balance due was to be financed by either a land contract, or a wraparound mortgage to be amortized over thirty-five years with an interest rate of 10% per annum and a balloon payment in twenty years.

The listing agreement explicitly set forth the conditions under which Goldman & Associates would collect its sales commission of $236,000—four percent of the gross

---

1. The jury verdict form did not provide a space for punitive damages. Since no issue is raised in this regard, we will assume that the verdict was the jury's award of compensatory damages.

sales price. A commission would be due if the property was

> sold, exchanged or rented during the term of this Agreement, or within six months after the expiration hereof, to any person or firm with whom, during the term of this Agreement, the Broker, Owner or other person may have negotiations, for the price, and upon the terms described ... or for a price and upon such terms as are acceptable to Owner.

The agreement provided that Goldman would earn his commission "upon execution of a contract" between the owner and purchaser. Another provision enabled the broker to purchase the property himself, and still collect the commission.

In May and July of 1982, the plaintiff, as broker for his own account, made two offers for the defendants' property. Both were rejected because they varied from the terms of sale required by the listing agreement. Apparently disenchanted with Goldman's services, Fadell sent one of Goldman's brokers a letter dated September 2, 1982, which terminated the listing agreement thirty days thereafter. On September 17, 1982, Goldman submitted another offer to purchase the park. Goldman offered the requested sales price of $5.9 million, with a down payment of $1.5 million and a wraparound mortgage. Although this purchase offer satisfied the minimal requirements outlined in the listing agreement, the parties continued to negotiate over other material terms. On February 18, 1983, Fadell signed a contract for sale of the property, and Goldman signed the contract on February 25, 1983. This sales contract superseded the sales commission provision of the listing agreement by making the commission payable upon close of escrow, instead of upon execution of the sales contract. The sales contract set forth additional requirements to which both parties agreed, but which both parties ultimately failed to satisfy. As a result, the sale never closed.

The major roadblock that the parties faced in closing the transaction concerned the new financing arrangements required by the contract. Fadell wanted to realize spendable cash through the sale, which the $1.5 million down payment required by the listing agreement could not provide. He expected to use the down payment to pay the income taxes from the sale, as well as to pay the existing variable-rate mortgages on the property. Goldman did not want to take the property with the existing variable-rate mortgages because of the rising interest rates.

Section 2.1 of the contract provided that the sale would be conditioned upon obtaining a loan of two million dollars, secured by a second lien on the park. The amortization period of the loan could not be less than twenty years, and the interest rate could not exceed 13½% per annum. If Fadell failed to obtain such a loan, Goldman was to have thirty days to secure such a commitment. Section 2.3 of the contract stated that if such a loan was not obtained within the requisite time, "or if the proposed terms of the new mortgage [were] unacceptable to the purchaser this Agreement [would] be terminated and of no further force or effect and neither party [would] have any further liability to the other." Because neither Fadell nor Goldman obtained the desired loan, Fadell eventually sold the park to another purchaser on February 28, 1985, two years after the sales contract was executed and twenty months after loan negotiations had ceased.

On appeal, Goldman contends that the District Court erred in not granting his motion for directed verdict, or his motion for JNOV. Even though the final sales contract expressly conditions payment of the commission upon the close of escrow, he alleges that the defendants, Fadell and his two companies, breached the listing agreement by withholding the sales commission from him. Goldman also asserts that the District Court erred in instructing the jury on "abstract" legal terms and issues which were not supported by the evidence, and which he contends may have misled the jury. In their cross-appeal, the defendants allege that the District Court incorrectly granted Goldman's motion for JNOV on their counterclaim for damages. They contend that he breached his fiduciary duties to them, and that the $100,000

damages awarded to them by the jury should have been upheld. The District Court had diversity jurisdiction under 28 U.S.C. § 1332, and we have final judgment jurisdiction under 28 U.S.C. § 1291.

## II

Goldman challenges the denial of his motion for JNOV on his contract claim. He contends that because his September 1982 offer to purchase the park conformed to the terms set out in the listing agreement, he produced a ready, willing and able buyer. Although he did not ultimately purchase the park, he claims that his offer and execution of the sales contract were sufficient to award him the commission.

 In reviewing the District Court's denial of Goldman's motion for JNOV, we must apply the same standard used by the District Court. A motion for JNOV will be denied "where the evidence, along with all inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable men in a fair and impartial exercise of judgment may reach different conclusions." *Kolb v. Chrysler Corp.*, 661 F.2d 1137, 1140 (7th Cir.1981), *quoted in McKinley v. Trattles*, 732 F.2d 1320, 1323–24 (7th Cir.1984). *See also Estate of Davis v. Johnson*, 745 F.2d 1066, 1070 (7th Cir.1984). In applying such a standard, we will not evaluate the credibility of the witnesses, or otherwise consider the weight of the evidence. *See Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970).

The trial court determined that Indiana law governed in this diversity case. Since neither party challenges this conclusion, we agree and will apply Indiana law here. The Indiana courts have clearly refused to interpret exclusive listing agreements as guaranteeing a sales commission to real estate brokers regardless of the circumstances surrounding the sale. *See Brown v. Maris*, 128 Ind.App. 671, 150 N.E.2d 760 (1958) (citing *Thomas v. Hennes*, 78 Ind. App. 275, 135 N.E. 392, 395 (1922)). Rather, the courts have looked to the particular language of the contract in order to determine the rights of the broker. *See Brown*

*v. Maris*, 150 N.E.2d at 760. *See also McKenna v. Turpin*, 128 Ind.App. 636, 151 N.E.2d 303 (1958).

 In order to determine the defendants' obligations to Goldman, we must consider both the listing agreement, as well as the terms of the superseding sales contract negotiated between the parties. In the absence of fraud, a written contract is merged with all prior and contemporaneous negotiations and contracts on the subject. *See generally Vernon Fire & Casualty Ins. Co. v. Thatcher*, 152 Ind.App. 692, 285 N.E.2d 660, 665 (1972); *Guido v. Baldwin*, 172 Ind.App. 445, 360 N.E.2d 842, 848 (1977). The terms of the listing agreement should be considered as merged with the sales contract because the sales contract was but an outgrowth of the listing agreement between the same parties. Even though Goldman's brokerage firm is referred to as "Goldman & Associates" in the listing agreement, and as "Goldman & Associates, Inc." in the sales contract, this minor discrepancy does not obfuscate the fact that the same parties were involved in both contracts. In addition, we note that the sales contract itself explicitly engrafts terms from the listing agreement. Section 12.1 of the sales contract promises to pay a commission according to the "amount set forth in Purchaser's listing contract."

 Although Goldman contends that the listing agreement only required him to produce a ready, willing, and able purchaser and an executed sales contract in order to collect a commission, the sales contract expressly required more. Section 12.1 stipulated that a commission would be paid "upon close of escrow." We thus conclude that the terms of the sales contract regarding payment of the commission superseded the conditions of the listing agreement. In order for Goldman to collect his commission, he was required to meet the terms of the sales contract.

Goldman and Fadell could not close the sale of the park because they failed to satisfy the condition precedent of the sales contract. The condition precedent of this contract required either party to obtain a

two million dollar loan upon certain specific terms and conditions. Since neither party satisfied this condition, the contract was never performed. Moreover, Goldman cannot claim that Fadell's inability to acquire the requisite loan waived the condition precedent. "[A] party may not rely on the failure of a condition precedent to excuse performance where that party's action or inaction caused the condition to be unfulfilled." *Kokomo Veterans, Inc. v. Schick,* 439 N.E.2d 639, 645 (Ind.Ct.App.1982). Goldman himself could have obtained the loan, but failed to do so.

We note here that some confusion exists as to whether Goldman was licensed in Indiana as a real estate broker. If he was not, this would nullify his claims because Indiana law requires brokers who list and sell Indiana real estate to be licensed in Indiana. *See* IND. CODE ANN. § 25–34.1–3–2 (Burns 1987). The District Court's opinion stated that Goldman was not licensed in Indiana, although it did not rely on this finding to make its decision. However, Goldman attested under oath to his Indiana licensing in the trial proceedings (Transcript at 322, 360), and in their appellate briefs, both parties concede this point. Moreover, the listing agreement implies that Goldman was properly licensed. In such circumstances, the Indiana courts have concluded that a broker has complied with the statute. *See Sutton v. Roth, Wehrly, Heiny, Inc.,* 418 N.E.2d 229, 232 (Ind.Ct.App.1981).

When we view all of the evidence presented in the light most favorable to Fadell, the non-movant in this motion for JNOV on the complaint, we are compelled to conclude that a fair and impartial jury could have reached the conclusion that a breach of the listing contract did not occur. We therefore affirm the District Court's denial of Goldman's motion for JNOV.[2]

### III

■ Goldman also alleges that the District Court erred in denying his motion for a directed verdict. In a diversity case, this court must apply the state standard of review to the trial court's decision to grant or deny a directed verdict. *See Cincinnati Insurance Co. v. Taylorville,* 818 F.2d 1345, 1348 (7th Cir.1987); *Chaulk v. Volkswagen of America, Inc.,* 808 F.2d 639, 640 (7th Cir.1986); *McMahon v. Eli Lilly Co.,* 774 F.2d 830, 832 (7th Cir.1985). Under Indiana law, an appellate court reviews a trial court's grant of a motion for directed verdict after considering only the evidence and all the reasonable inferences to be drawn therefrom in favor of the non-movant. *See Knight v. Baker,* 173 Ind.App. 314, 363 N.E.2d 1048, 1050 (1977). A directed verdict should only be granted where there is a total lack of evidence or legitimate inferences in favor of the non-movant, or where there is no conflict over the evidence and the sole possible inference favors the movant. *Id.* 363 N.E.2d at 1050. The evidence need not be convincing or uncontradicted, but there must be some evidence or inference supporting the non-movant on the issue. *See Strong v. Commercial Carpet Co.,* 163 Ind.App. 145, 322 N.E.2d 387, 391 (1975). *See also State v. Stone,* 160 Ind.App. 226, 311 N.E.2d 446, 447 (1974).

In light of our discussion of Goldman's motion for JNOV, we need not further consider the denial of his motion for a directed verdict. The trial court will be affirmed.

### IV

Goldman claims that the trial court committed reversible error when it instructed the jury on propositions and issues of law that allegedly were not supported by the evidence. He objected to five of the instructions given in the trial court, and takes issue with them again on appeal. Goldman contends that the trial court should not have accepted the defendants' tendered instructions on matters of offer and acceptance (instruction 2); absence of fraud or mistake, ambiguity and integration of prior negotiations (instructions 5

2. Given this conclusion, we need not address Goldman's contentions that he is entitled to damages and prejudgment interest from the date of the alleged breach.

and 8); conditions superseding or rescinding principal obligations (instruction 6); and performance of the contract (instruction 9). Moreover, Goldman claims that the court erred when it did not offer each of these instructions to the jury in the exact form in which they were submitted by the defendants.

■ In general, appellate review of jury instructions is limited. *See Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1117 (7th Cir.1983). When reviewing the adequacy of jury instructions, the court should "construe them in their entirety and not in artificial isolation." *Id.* at 1117. Reversal is only mandated if the jury's comprehension of the issues is so misguided that a litigant is prejudiced. *See Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 597 (7th Cir.1985).

Our analysis and review of the jury instructions indicates that the trial court did not err. According to Indiana law, which governs the substance of the jury instructions, *see Simmons, Inc.*, 762 F.2d at 595, they may be given if they are "pertinent to the issues or applicable to the evidence." *Mullins v. Bunch*, 425 N.E.2d 164, 165–166 (Ind.1981). *See also Board of Commissioners v. Klepinger*, 149 Ind.App. 377, 273 N.E.2d 109, 114 (1971). The Indiana Court of Appeals has stated: "In reviewing a claim that the evidence was insufficient to support the giving of an instruction, we may only look to that evidence most favorable to the appellee and the reasonable inferences drawn therefrom. If there is any evidence to support the instruction, its giving is proper." *Dominguez v. Gallmeyer*, 402 N.E.2d 1295, 1300 (Ind.Ct.App. 1980). Jury instructions are evaluated as a whole to determine if they are appropriate to the evidence. *See Mullins v. Bunch*, 425 N.E.2d at 166.

■ All of the disputed instructions pertained to issues that were raised during trial. The instructions elucidated legal terms germane to the breach of contract claim alleged in Goldman's complaint. Goldman argues that it was improper for the court to instruct the jury on any issue related to the defendants' counterclaim because the defendants failed on their counterclaim. However, such an argument would force us to conclude that jury instructions are never proper if they relate to a defeated claim. We cannot accept such a specious conclusion.

We must also reject Goldman's allegation that the trial court was precluded from editing the disputed instructions before proffering them to the jury. This contention is too lacking in merit to warrant discussion.

V

■ In their cross-appeal, the defendants contend that the District Court erred in granting the plaintiff's motion for JNOV on their counterclaim. They allege that Goldman breached his fiduciary duties to them by failing to use his "best efforts" as required by the listing agreement, and that the jury award of $100,000 for tort and punitive damages should be upheld.[3] The trial court judge determined that the jury's verdict for the defendants on the counterclaim was unsupported by the evidence, both in terms of liability and the damages awarded. He found that the jury may have been prejudiced by Goldman's "multicorporate style of acting as a man with many faces, rather than a fair weighing of the evidence."

After considering the evidence under the appropriate standard as set forth in Part II of this opinion, we conclude that the District Court was correct. The damage award was not supported by the evidence. Thus, we need not consider whether the jury correctly found that Goldman breached his fiduciary duties.

The defendants allege four different bases upon which the damage award should have been allowed to stand. First, they argue that they should be awarded damages for the four-month delay between Goldman's rejected May 1982 offer and his September 1982 offer. Second, they claim that Goldman's "continuing pattern of mis-

---

**3.** *See* n. 1 for our earlier discussion of the jury verdict form.

conduct" delayed the subsequent sale of the property for one year, and that they should be awarded interest on the difference between the contract price and the ultimate sales price. Third, Fadell claims that he should be compensated for his lost opportunity to purchase, at a lower cost, the minority shareholders' interests in his two land companies. Finally, Fadell contends that he should be compensated for the three-year delay between the time that the listing agreement was signed and the time that the park was sold. He claims that he was deprived of an opportunity to "relax a little bit" for three years.

To succeed on their claim for damages, the defendants must support their allegations with specific evidence. *George E. Hoffman & Sons, Inc. v. International Bhd. of Teamsters*, 617 F.2d 1234, 1247 (7th Cir.), *cert. denied*, 449 U.S. 937, 101 S.Ct. 335, 66 L.Ed.2d 160 (1980). The defendants have simply failed to point to any specific facts to support their allegations of damage, or to substantiate the jury award. Assuming *arguendo* that Goldman breached his fiduciary duty to the defendants, that does not automatically result in an award of damages where no proof of damage is presented. The trial court was correct in granting plaintiff's motion for JNOV on the counterclaim.

### Conclusion

Having reviewed the record and evidence presented, we conclude that the District Court was correct in denying the plaintiff's motion for JNOV on his complaint for breach of contract. We also conclude that the trial court correctly granted the plaintiff's motion for JNOV on the defendants' counterclaim for breach of fiduciary duty. We therefore affirm the orders of the District Court.