979 F.2d 1187
 37 Fed. R. Evid. Serv. 37
 John D. ALLISON, Bayfield Electric Cooperative, Robert E.
Cadwell, et al., Plaintiffs-Appellees,
v.
TICOR TITLE INSURANCE COMPANY, Defendant-Appellant.
John D. ALLISON, Paul R. Phillips, Mary B. Phillips, et al.,
Plaintiffs-Appellants,
v.
TICOR TITLE INSURANCE COMPANY, Defendant-Appellee.
 Nos. 91-1893, 91-2025.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 29, 1992.
Decided Nov. 12, 1992.
As Amended Nov. 19, 1992.
As Amended on Denial of Rehearing
Jan. 22, 1993.
 
 John Cates, Lawton & Cates, Madison, Wis., Barry Levenstam, Michael T. Brody, Jerold S. Solovy, Diane I. Bonina, Jenner & Block, Chicago, Ill., Alan Kildow (argued), John Cotter, Larkin, Hoffman, Daly & Lindgren, Bloomington, Minn., for plaintiffs-appellants.
 Joshua G. Vincent (argued), William J. Holloway, William G. Swindal, Hinshaw & Culbertson, Chicago, Ill., Thomas A. Lockyear, Bell, Metzner & Gierhart, Madison, Wis., for defendant-appellee.
 James E. Doyle, Atty. Gen., Laura Sutherland, Asst. Atty. Gen., Office of the Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., amicus curiae.
 Before CUMMINGS and COFFEY, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.
 HARLINGTON WOOD, Jr., Senior Circuit Judge.
 
 
 1
 This appeal arises from lawsuits filed by three different groups of plaintiffs against Ticor Title Insurance Company ("Ticor"). Jurisdiction in the district court was based on diversity. Defendant Ticor is a California corporation, and the plaintiffs are all residents of states other than California. Jurisdiction in this court exists as an appeal from final judgment as to all claims and all parties.
 
 
 2
 The plaintiffs in these three cases all held seventy-five year leases on units in a 200-unit condominium resort called Telemark Lodge located in Cable, Wisconsin. The unitholders' leasehold interests were insured by title policies issued by Ticor. Two groups of plaintiffs sued Ticor in a consolidated case to recover under their insurance policies after losing their leases in bankruptcy proceedings initiated by Telemark Land Company, the developer of Telemark Lodge. On July 16, 1990, this court held Ticor had wrongfully refused to defend the Allison and Bayfield plaintiffs against claims filed by the Telemark trustee concerning their titles during the Telemark bankruptcy. Allison v. Ticor Title Ins. Co., 907 F.2d 645, 650 (7th Cir.1990). This court held that Ticor was liable and remanded the case to the district court for further proceedings concerning damages. While that appeal was pending in this court, the Cadwell plaintiffs started an action against Ticor in district court. After a jury verdict in favor of the Cadwell unitholders, the district court held that the Cadwell plaintiffs were in the same position as the Allison and Bayfield plaintiffs. Because of our decision in Allison vacating and remanding the two cases, the district judge vacated the Cadwell judgment and consolidated all three cases for a trial on damages. The jury trial was held the first week of October in 1990. The jury returned a special verdict that the leases had a fair market value of $24,000 each in the fall of 1985. The district court reduced each plaintiffs' recovery by $1,250, the amount they each received for their interests from the bankruptcy court when the lodge was sold. Plaintiffs' request for prejudgment interest was denied after the district court concluded that title insurers were exempt from Wis.Stat. § 628.46. Ticor is appealing both the liability judgment in Cadwell and the damages award for all three cases while plaintiffs are cross appealing the denial of prejudgment interest.
 
 
 3
 We affirm the district court's denial of Ticor's motion for a directed verdict in the Cadwell liability trial and find that there was sufficient credible evidence to support a jury verdict in favor of the nonmoving party. We affirm the district court's denial of Ticor's motions for judgment notwithstanding verdict and a new trial in the Cadwell liability trial. We hold that the district court did not abuse its discretion in denying Ticor a new trial on damages. We do, however, reverse the district court's denial of prejudgment interest under Wis.Stat. § 628.46. We hold that title insurers are not exempt from this provision.
 
 BACKGROUND FACTS
 
 4
 Telemark Land Company developed the condominium resort called Telemark Lodge in Cable, Wisconsin which is in northern Wisconsin near the Chequamegon National Forest. The resort included the lodge, restaurants, convention facilities, stores, swimming pools, ski areas, tennis courts, a health center, and a golf course. The lodge had 200 rooms, or efficiencies, as condominium units. The lodge cost approximately six million dollars to construct and was financed by selling to the unitholders seventy-five year leasehold interests in the condominium units and undivided one-half interests in the common areas of the lodge. Units sold for $27,000-$29,000 in 1972. Each unit was approximately 405 square feet. Ticor issued title insurance policies for an amount equal to the purchase price for each unit. Along with the lease came membership in the Telemark Lodge Owners Association ("TLOA") and the right to participate in a rental arrangement of the units. Lessees could occupy their units whenever they pleased and ask the lodge to rent the units when they were unoccupied. The TLOA entered into a management agreement with Telemark Land Company's affiliate Telemark Management Company to operate the lodge. In 1978, the rental system was abandoned and instead each unitholder leased his or her condominium to the TLOA. The unitholders thereby gave up their right to a particular unit and had to make reservations to stay in the lodge. The TLOA subleased the lodge and all of the units to Telemark Management Company which operated the resort like a hotel. Costs and revenues from room rentals were pooled and the net disbursed pro rata to the management company and the unitholders.
 
 
 5
 In 1981, Telemark Land Company and its affiliates, including Telemark Management Company, filed for bankruptcy. Attempts at reorganization failed and the bankruptcy was converted from a Chapter 11 reorganization to a Chapter 7 liquidation in 1984. A trustee was appointed who, after inspection of the lodge, filed an adversary complaint in September 1984 against approximately 350 defendants including each unitholder, mortgagee, and the TLOA. The complaint, referred to as Kaiser I, sought to terminate the leases alleging that the unitholders had defaulted on their lease obligations to repair and maintain the lodge. The evidence showed that the lodge had fallen into some disrepair. The Telemark trustee filed a second adversary complaint, referred to as Kaiser II, in April 1985. The Kaiser II complaint alleged that questions over the unitholders' compliance with their repair obligations created a "bona fide dispute" about the status of their leases. 11 U.S.C. § 363(f)(4) allows a bankruptcy trustee to sell property free of any interest in such property if "such interest is in bona fide dispute." The bankruptcy court must resolve the dispute and pay the lessees from the proceeds of the sale if their claims are valid.
 
 
 6
 The Kaiser II complaint sought approval to sell the lodge free of the leaseholds to Edward Hurley for three million dollars. The TLOA hired an attorney to represent the association in the bankruptcy proceedings. Approximately 75% of the unitholders signed forms sent to them by the TLOA which authorized the attorney to represent them individually. The TLOA also tried at various points in the litigation to purchase the lodge and other related Telemark assets leaving the unitholders' interests intact. At a TLOA meeting held on May 4, 1985, a resolution was passed by the members permitting the TLOA to make such an offer. One week before the trial of the Kaiser I and II complaints, a purchase and settlement agreement was signed by the trustee and the TLOA on June 6, 1985, (the "Purchase Agreement") which gave the TLOA four months to raise money for the purchase of the lodge. The Purchase Agreement further stated that if the TLOA failed to obtain financing, the TLOA would agree to any sale of the property if for more than three million dollars. The bankruptcy court approved this settlement in July 1985. After attempts to purchase the lodge and other assets failed, the trustee served a notice on September 17, 1985, which amended Kaiser II by adding the additional claim that the unitholders did not own or possess leasehold interests but were merely equity investors in the lodge and/or mortgage holders on the lodge. This notice stated that any defendant not objecting to the Purchase Agreement by September 27 would be deemed to have consented to a sale and be bound by the agreement. This deadline for objections was extended by the bankruptcy court's own notice to October 17, 1985, when a hearing was scheduled concerning the merits of the Kaiser II claims and any objections to the Purchase Agreement.
 
 
 7
 On October 2, eighteen unitholders notified Ticor of the equity investment claim and requested defense to this claim because the trustee was claiming the unitholders apparently had never obtained good title and were simply equity investors. This notice sufficiently raised the question of title and Ticor's obligation to defend for all the unitholders. On October 7, Ticor denied coverage and refused to defend any of its insureds. Ticor made it clear that it would neither defend nor indemnify any of the unitholders.
 
 
 8
 Following the hearing, the bankruptcy court authorized the sale of the lodge after determining that there was a bona fide dispute about whether the unitholders were lessees or equity investors. The bankruptcy court did not make any specific findings about the genuine dispute over the leases. The lodge was eventually sold free of the leases, and each unitholder received $1,250 for the units according to a distribution formula from the Purchase Agreement.
 
 
 9
 The two groups of plaintiffs sued Ticor to recover under their policies reasoning that the bankruptcy court must have determined that they never had good title and that Ticor breached its duty to defend them. The Allison plaintiffs promptly objected to the Purchase Agreement while the Bayfield plaintiffs did not object until almost a year after the hearing in October of 1985. This court held that Ticor breached its duty to defend the plaintiffs in the bankruptcy proceedings and was estopped from arguing that any exclusion in the policy applied. It was during this appeal that the Cadwell plaintiffs filed suit against Ticor for similar claims. The Cadwell plaintiffs never objected to the Purchase Agreement, but argued they were not bound by it. After a trial in February 1990, the jury in the Cadwell case decided that while the TLOA was an agent of the Cadwell plaintiffs, the act of entering into the Purchase Agreement was not within the scope of either its agency authority or apparent authority. The jury further found that the plaintiffs did not ratify the Purchase Agreement before the October 17, 1985, bankruptcy hearing. The Cadwell judgment was vacated after this court's decision regarding the Allison and Bayfield cases. The three cases were then consolidated for a trial on damages held in October 1990.
 
 ANALYSIS
 The Cadwell Liability Verdict
 
 10
 Simply put, Ticor's defense in the Cadwell trial was that the Cadwell plaintiffs were bound by the June 6, 1985, Purchase Agreement, and therefore Ticor did not breach any duty to defend them under their title policies and was not liable to the plaintiffs. Under the terms of the policy, the insured is covered so long as the insured retains an interest in the land. If the plaintiffs relinquished their interests in the Purchase Agreement, their policies had terminated before the Telemark bankruptcy trustee asserted the title defect claim which activated Ticor's duty to defend. The district court framed the issue in this exact manner for trial in February 1990. In its Final Pre-Trial Conference Order of February 13, 1990, the district court stated that:
 
 
 11
 [T]he only issue which must be determined by the jury is whether or not these plaintiffs are bound by the June 1985 purchase and settlement agreement entered into between the trustee in bankruptcy and TLOA. In the event the plaintiffs are found to be bound by the agreement, then any duty to defend or indemnify is nonexistent.
 
 
 12
 In the event the plaintiffs are found not to be bound by said agreement, then they are in the same position as those plaintiffs in the Allison and Bayfield matters and prevail. The doctrine of collateral estoppel bars relitigation of those issues previously determined by this court.
 
 
 13
 Neither party objected to this presentation of the issue for trial. Ticor only objects that the issue even went to the jury.
 
 1. Ticor's motion for a directed verdict
 
 14
 Ticor argues that the district court erred in not directing a verdict in Ticor's favor because the plaintiffs stipulated that they had not objected to the Purchase Agreement. Ticor argues that under the doctrine of judicial estoppel, the plaintiffs could not assert that they were not bound by the agreement in district court after taking the position in the bankruptcy court that they were bound by the settlement. Ticor further argues that under bankruptcy law the failure to object to a bankruptcy court's order authorizing a sale constitutes consent to the sale. Ticor asks that as a matter of law judgment be entered in favor of Ticor on the Cadwell claims.
 
 
 15
 In a diversity case, this court must apply the state standard of review to the district court's decision to deny or grant a directed verdict. Certain Underwriters of Lloyd's & Cos. Subscribing to Excess Aviation Liability Ins. Policy No. FL-10959 A & B v. General Accident Ins. Co., 909 F.2d 228, 233 (7th Cir.1990); Goldman v. Fadell, 844 F.2d 1297, 1301 (7th Cir.1988) (listing cases). Under Wisconsin law, a motion challenging the sufficiency of the evidence as a matter of law shall be granted only if "the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." Wis.Stat. § 805.14(1). The standard of review under Wisconsin law requires that if there is any evidence which supports the nonmoving party's cause of action, then the motion was correctly denied. Wisconsin Natural Gas Co. v. Ford, Bacon & Davis Constr. Co., 96 Wis.2d 314, 291 N.W.2d 825, 836 (1980); Kozlowski v. John E. Smith's Sons Co., 87 Wis.2d 882, 275 N.W.2d 915, 922 (1979).
 
 
 16
 Ticor claims that the district court should have directed a verdict in its favor because plaintiffs were judicially estopped from asserting a position in the district court different from that asserted in the bankruptcy court.[1] Judicial estoppel is an equitable concept designed to prevent the perversion of the judicial system. Matter of Cassidy, 892 F.2d 637, 641 (7th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990). The doctrine precludes parties from abandoning positions taken in earlier litigation. As this court explained: "The principle is that if you prevail in Suit # 1 by representing that A is true, you are stuck with A in all later litigation." Astor Chauffeured Limousine Co. v. Runnefeldt Inv. Corp., 910 F.2d 1540, 1547 (7th Cir.1990). Judicial estoppel, however, is applied only where the party prevails in suit # 1 and then tries to take a position in suit # 2 inconsistent with that taken in suit # 1. Id. at 1548. The theory is that a party should not win twice on the basis of incompatible positions. Id.
 
 
 17
 Ticor argues that because the Cadwell plaintiffs have stipulated that they did not object to the Purchase Agreement, they must be deemed to have consented to the agreement in the bankruptcy court. Thus, the plaintiffs should be estopped from denying in the Cadwell case that they ever authorized the agreement.
 
 
 18
 We do not believe that the Cadwell plaintiffs have taken inconsistent positions in two different suits. In bankruptcy court, the plaintiffs were found by the court to be bound to the Purchase Agreement because of waiver. The plaintiffs certainly did not prevail in bankruptcy court because of this position. In the Cadwell trial, the plaintiffs argued that they did not sign, consent to, authorize, or ratify the Purchase Agreement. Ultimately, the district court found that the plaintiffs were not bound by the agreement. Ticor cannot show when the plaintiffs testified or introduced evidence in the bankruptcy court that was inconsistent with their position in district court. Judicial estoppel is not applicable here when defendant is really trying to argue that the Cadwell unitholders were bound by the Purchase Agreement by the sole fact that they failed to object to it.
 
 
 19
 Ticor's next argument in support of its motion for directed verdict is that, "the failure to object to a bankruptcy order authorizing a sale pursuant to a settlement constitutes consent to be bound by the settlement as a matter of law." Plaintiffs moved to strike this portion of Ticor's brief because it was not raised in district court. Ticor relies upon 11 U.S.C. § 363(f)(2) and In re Gabel, 61 B.R. 661 (W.D.La.1985) in support of its argument. Based upon our review of the record, plaintiffs are correct in claiming that Ticor never cited this statute or any case on bankruptcy law to the district court. While it is true that an argument cannot be raised for the first time on appeal, it is also true that a party may attack the legal theory upon which the district court based its decision. Hedge v. County of Tippecanoe, 890 F.2d 4, 8 (7th Cir.1989); Toney v. Burris, 829 F.2d 622, 626-27 (7th Cir.1987). The district court opened the door, though ever so little, with its ruling in its Memorandum and Order of July 10, 1989, that "There is no law that provides that failure to object renders a Purchase and Settlement Agreement invalid."
 
 
 20
 We need not resolve the extent to which consent can be implied under section 363(f)(2) because Ticor breached its duty to defend the plaintiffs before they could be deemed to have consented by default. Ticor refused to defend any of its insureds on October 7, 1985. Because plaintiffs had until October 17, 1985, to object to the Purchase Agreement or else be deemed to have waived their rights to a hearing by the bankruptcy court, Ticor's refusal on October 7 to aid the plaintiffs obviates its argument that plaintiffs must be bound by the agreement. Under Wisconsin law an insurer's refusal to defend when a defense is necessary estops the insurer from asserting the claim is uncovered by the policy. Professional Office Bldgs., Inc. v. Royal Indemnity Co., 145 Wis.2d 573, 427 N.W.2d 427 (Ct.App.1988); Allison v. Ticor Title Ins. Co., 907 F.2d 645, 649 (7th Cir.1990). This consent argument is factually untenable and is properly rejected as a basis for a directed verdict.
 
 
 21
 After reviewing the record, we find that there was credible evidence supporting the verdict that the plaintiffs were not bound by the Purchase Agreement. The jury heard testimony by nine Cadwell unitholders about their involvement in the bankruptcy proceedings. There was evidence that the TLOA was not authorized to sell the unitholders' interests or negotiate a settlement on behalf of these unitholders. The unitholders' bankruptcy lawyer further testified that he was negotiating only on behalf of the TLOA and that he did nothing to bind individual unitholders to the Purchase Agreement. While Ticor presented evidence at trial that could have led a jury to conclude differently, there is credible evidence supporting the jury's verdict in favor of the plaintiffs. The district court denied plaintiffs' motion for summary judgment because it found that there were genuine issues of material fact concerning the binding nature of the Purchase Agreement on the plaintiffs. These issues were resolved by the jury after judging the credibility of the witnesses and weighing the evidence. When reviewing a denial of a motion for directed verdict under Wisconsin law, "[i]t is basic that the credibility of the evidence and the inferences to be drawn therefrom are matters for the jury." Kozlowski, 275 N.W.2d at 922 (citation omitted). Because the record shows credible evidence to support a verdict in favor of the plaintiffs, Ticor was not entitled to a directed verdict as a matter of law.
 
 
 22
 Ticor alternatively moved for a directed verdict arguing that the Telemark trustee never asserted a title defect claim against the Cadwell plaintiffs. Ticor claims that the September 17, 1985, notice which amended the Kaiser II complaint to add the equity investment claim was directed only at those unitholders objecting to the Purchase Agreement. Ticor argues that since the equity investment claim was not asserted against non-objecting unitholders, the Cadwell plaintiffs, Ticor did not breach any duty to defend them. Therefore, there is no causal connection between Ticor's breach of a duty to defend the objecting unitholders, the Allison and Bayfield plaintiffs, and the Cadwell plaintiffs' loss of their units.
 
 
 23
 The district court correctly denied Ticor's motion for a directed verdict based upon this unasserted claim argument. The September 17, 1985, notice clearly addresses all unitholders. The notice states at one point that: "Any Defendant failing to file ... objections shall waive all rights to any hearing held subsequent thereto and shall be deemed to have consented to said sale and bound by said agreement." This notice gives all unitholders a chance to object and defend themselves at a hearing scheduled for October 8, 1985. Ticor's duty to defend arose after the unitholders notified Ticor of the title defect claim asserted against all of them. Ticor unequivocally denied coverage and refused to defend any of its insureds. The district court properly found that credible evidence existed to support the finding that Ticor did assert the equity investment claim against the Cadwell plaintiffs.
 
 
 24
 2. Ticor's motion for judgment notwithstanding verdict
 
 
 25
 Ticor contends that it was entitled to judgment notwithstanding verdict ("JNOV") because the plaintiffs either authorized or ratified the Purchase Agreement. The jury found that although the TLOA was an agent of the plaintiffs, the act of entering into the Purchase Agreement was beyond the scope of the TLOA's agency authority and that the TLOA did not have the apparent authority to act as plaintiffs' agent for the agreement. The jury further found that the plaintiffs did not ratify the agreement.
 
 
 26
 The standard of review for a federal court sitting in diversity is determined by state law. Krist v. Eli Lilly & Co., 897 F.2d 293, 296 (7th Cir.1990). When reviewing a district court's denial of a motion for JNOV, we must apply the same standard as the district judge. Goldman v. Fadell, 844 F.2d 1297, 1300 (7th Cir.1988). We review the denial of a motion for JNOV de novo. Fort Howard Paper Co. v. Standard Havens, Inc., 901 F.2d 1373, 1382 (7th Cir.1990). Under Wisconsin law, a trial judge is not justified in setting aside a verdict and directing judgment if there is any credible evidence to support the jury's findings. Bennett v. Larsen Co., 118 Wis.2d 681, 348 N.W.2d 540, 544 (1984). Wisconsin Statute section 805.14(5)(b) states that a party may move the court for JNOV when "the verdict is proper but, for reasons evident in the record which bear upon matters not included in the verdict, the movant should have judgment." The Wisconsin Supreme Court has repeatedly held that the motion does not challenge the admissibility of evidence nor its sufficiency to support the verdict. See Kolpin v. Pioneer Power & Light Co. Inc., 162 Wis.2d 1, 469 N.W.2d 595, 606 (1991). The purpose of the motion is for judgment in favor of the moving party and not a new trial. State v. Escobedo, 44 Wis.2d 85, 170 N.W.2d 709, 711 (1969). The motion admits for the purposes of the motion that the findings of the verdict are true, but asserts that judgment should be granted on grounds other than those decided by the jury. Herro v. Department of Natural Resources, 67 Wis.2d 407, 227 N.W.2d 456, 461 (1975); Escobedo, 170 N.W.2d at 711.
 
 
 27
 In its brief, Ticor does not always distinguish between the motions for a directed verdict and JNOV in its argument to the court. At the district court level, Ticor also repeated several arguments for both motions. Throughout this litigation, Ticor has raised the same or similar arguments which have repeatedly been rejected by the district court. Wisconsin law recognizes a distinction between the motions and on our review of the record, we cannot find, nor has Ticor provided, any reason why judgment should be granted in Ticor's favor notwithstanding the jury's verdict. See Kolpin, 469 N.W.2d at 606. We accept the facts in the jury's verdict to be true and find no other evidence proving why plaintiffs must be found to be bound by the settlement. Whether the TLOA had the apparent authority or whether the plaintiffs ratified the Purchase Agreement must be determined by examining the multitude of evidence presented at the trial. The fact that the plaintiffs did not object to the Purchase Agreement does not alone make the agreement binding on the plaintiffs. A motion for JNOV must be denied if after viewing the evidence in the light most favorable to the nonmoving party, reasonable people could fairly reach different conclusions. Kolb v. Chrysler Corp., 661 F.2d 1137, 1140 (7th Cir.1981). In applying this standard, we do not evaluate the credibility of the witnesses or otherwise consider the weight of the evidence. Goldman, 844 F.2d at 1300. We affirm the denial by the district court of the JNOV motion.
 
 3. Ticor's motion for a new trial
 
 28
 The district court denied Ticor's motion for a new trial, and we will not reverse the decision unless there are exceptional circumstances showing a clear abuse of discretion. Cygnar v. City of Chicago, 865 F.2d 827, 835 (7th Cir.1989). Although jurisdiction is based on diversity, we review the district court's decision according to federal law. Mercado v. Ahmed and Checker Taxi Co., Inc., 974 F.2d 863, 866 (7th Cir.1992). A new trial may be granted for these reasons: (1) the verdict is against the clear weight of the evidence; (2) the damages are excessive; or (3) the trial was unfair to the moving party. Cygnar, 865 F.2d at 835. In reviewing a motion for a new trial, we view the evidence in the light most favorable to the prevailing party. We will not set aside the jury's verdict if there is a reasonable basis in the record which supports that verdict. M.T. Bonk Co. v. Milton Bradley Co., 945 F.2d 1404, 1407 (7th Cir.1991). "We adopt this posture because of our recognition that the 'district court, having seen the presentation of evidence and observed the course of the trial, is in a unique position to rule on a new trial motion.' " Mercado at 866 (citation omitted).
 
 
 29
 Ticor argues that the district court committed several errors which mandate reversal. First, Ticor argues the admission of William Lewis' testimony that a unitholder would have to "sign off" on the Purchase Agreement before the unitholder's interest could be transferred was prejudicial error. Lewis was the unitholders' bankruptcy counsel, and Ticor argues that he expressed an opinion as to contractual rights and the legal effects of the Purchase Agreement that was improper under the Federal Rules of Evidence. Ticor argues this was reversible error by the district court to allow such opinion testimony concerning legal conclusions to be made by the judge and the jury.
 
 
 30
 We do not believe that the district court abused its discretion in admitting this evidence. While the basic premise that an expert may not testify to the legal significance of a contract is unavoidable, the district court did not abuse its discretion in finding that Lewis testified as a fact witness as well as an expert witness. The district court found that Lewis' testimony was not necessarily a legal conclusion which should be excluded because the issue was a determination of what transpired during the course of the drafting of the Purchase Agreement. Lewis' testimony related more to issues of fact than to opinion. Moreover, even if the testimony was inadmissible evidence, the amount of other testimony and evidence at trial minimizes any impact it may have had on the jury's verdict under the harmless error rule.
 
 
 31
 Ticor further contends that the district court erred in not instructing the jury that ratification of the Purchase Agreement may be inferred by the plaintiffs' silence, acquiescence, or inaction concerning the agreement. Ticor contends that Wisconsin law and Wisconsin's standard jury instruction on agency ratification support such an instruction.
 
 
 32
 The only case that Ticor cites in support of this argument is Balzer v. Weisensel, 258 Wis. 566, 46 N.W.2d 763 (1951). In Balzer the Wisconsin Supreme Court held that the defendant was bound by the settlement executed by his attorney in open court despite that defendant was not present in court and did not sign the agreement. The court recognized that the power of an attorney to compromise a case during the progress of the suit in open court is an exception to a more general rule that an attorney has no power to bind a client by a compromise agreement. Id., 46 N.W.2d at 764. The court found there was ample evidence that the defendant had clothed his attorney with apparent authority to settle a case involving as little as this did. Id. at 765. Balzer is readily distinguishable from the instant case because neither the unitholders nor their attorney signed the Purchase Agreement. Furthermore, the jury found that the unitholders had not authorized or ratified the agreement and that the TLOA did not have the apparent authority to bind them to the agreement.
 
 
 33
 Ticor also contends that because Wisconsin's standard jury instruction on agency ratification contains a comment that ratification may be inferred by silence, the district court erroneously instructed the jury. Ticor argues that the jury was led to believe that an affirmative act was required for ratification because of the district court's instruction on ratification.
 
 
 34
 We evaluate the jury instructions as a whole when evaluating a district court's refusal to give a particular instruction. United States v. Gometz, 879 F.2d 256 (7th Cir.1989), cert. denied, 493 U.S. 1033, 110 S.Ct. 752, 107 L.Ed.2d 768 (1990). We must determine whether the instructions as a whole fairly and adequately conveyed the correct message to the jury. Certain Underwriters of Lloyd's & Cos. Subscribing to Excess Aviation Liability Ins. Policy No. FL-10959 A & B v. General Accident Ins. Co. of Am., 909 F.2d 228, 234 (7th Cir.1990). The district court instructed the jury that "A principal affirms the unauthorized acts of an agent if the principal indicates by his or her words or acts that he or she accepts and treats the conduct of the agent as authorized." It is clear that "words or acts" encompasses the concept of silence. Additionally, Ticor's counsel indicated to the jury that silence was one way to act in order to ratify. We believe the district court properly instructed the jury. We do not find that substantial rights of the defendant were affected by the court's instructions requiring a new trial.
 
 The Joint Damages Trial
 
 35
 The damages trial for the Allison, Bayfield, and Cadwell plaintiffs was held in the first week of October 1990. Pursuant to our earlier opinion in Allison v. Ticor Title Ins. Co., 907 F.2d 645 (7th Cir.1990), the district court limited the trial solely to a determination of the fair market value of a leasehold interest in Telemark Lodge in the fall of 1985. In Allison we remanded the case for further proceedings concerning damages with the instructions that the value of the lessees' interests must be determined in the absence of any question about the validity of title. Id. at 651, 653. We held in Allison that the lessees were not entitled to recover the full amount of their policies, but instead should recover what they actually lost because of what we must assume (given the failure to defend) was a defect in their title. Actual loss we held should be calculated from the date the defect in title was discovered which would be either the September 17, 1985, notice by the trustee or the sale of the lodge more than a year later. We further emphasized that the value of the units and not the lodge was what needed to be determined by the district court.
 
 
 36
 Ticor appeals the district court's denial of Ticor's motion for a new trial on damages. Ticor argues that the district court's approach during the damages trial was fatally inconsistent with Wisconsin law as well as our decision in Allison. Ticor claims that the district judge believed the value of the units could be determined by dividing up the value of the lodge and admitted improper evidence concerning the lodge's value which prejudiced Ticor. Ticor objects to the exclusion of the Kaiser I and II adversary complaints from evidence. Ticor further argues that the admission of testimony based upon the future income approach to valuation was improper and warrants a new trial. For these reasons, Ticor maintains it was denied a fair trial on damages in district court.
 
 
 37
 Because we have already set forth the standard of review of a district court's denial of new trial, we need not repeat it here. Our review of the record shows that the district court did not abuse its discretion in denying the defendant a new trial. On remand the district court properly conducted the trial and framed the issues for the jury in order to determine the fair market value of the units.
 
 
 38
 1. Evidence concerning the value of the lodge
 
 
 39
 Ticor contends that statements by the district judge indicate that the judge improperly admitted evidence about the value of the lodge for the purpose of determining the value of the units. For example, the district judge stated at one point in the middle of the trial that:
 
 
 40
 [W]e're attempting here to unscramble the egg--what portion of any offer which may have been received or any value which may eventually be placed on this complex, this lodge, is attributed to the unitholders.... We're attempting to attribute to the leasehold interests those portions of a value which is placed on a lodge....
 
 
 41
 Allison Record at 450-51. While we stated in Allison that the bankruptcy sale simply established the value of the lodge and not the price of the units within it, we did not hold that evidence concerning the value of the lodge was irrelevant or inadmissible. Allison, 907 F.2d at 652. We simply did not know how the bankruptcy figure was calculated. It was certainly within the district court's discretion to rule that evidence concerning the lodge's value and certain offers of purchase of the lodge were relevant to the fair market value of the individual leases. Moreover, it is worth noting that Ticor argued to the jury that the bankruptcy sale price divided by the number of units within it was a fair estimate of the units' value. Ticor's own expert witness testified that he looked at the lodge as a whole when evaluating the value of an individual unit. This witness also testified that he did not appraise individual units but instead took an average.
 
 
 42
 2. The Kaiser I and II complaints and other bankruptcy evidence
 
 
 43
 The district court excluded the adversary complaints from evidence because the court believed that they were related to the title defect claim. Because we held in Allison that the value of the units must be decided in the absence of any question about the validity of title, the district court ruled that these documents, and any references to them, would lead to questions about the validity of title, Ticor's liability, or any of the possible reasons why the leaseholders lost their interests. "[A]ny information concerning Ticor's duty to defend or the title defect involved peripheral issues not relevant to the fair market value of the leaseholds. The court is of the opinion that much of the evidence which the parties attempted to place before the jury was so closely intertwined with aspects of liability that its inclusion would have been contrary to the Seventh Circuit Allison decision." Memorandum and Order of Jan. 24, 1991 at 5. It was not an abuse of the district court to conclude that the Kaiser complaints were not relevant to the determination of fair market value when the complaints would directly have raised the question of why there was a threat hanging over the leases. Because Ticor had already been found to have breached its duty to defend, Ticor was estopped from contending that the claims in the complaints were not covered by the policy. See Allison, 907 F.2d at 649; Professional Office Bldgs., Inc. v. Royal Indemnity Co., 145 Wis.2d 573, 427 N.W.2d 427 (Ct.App.1988). It is logical that Ticor should not later be allowed to assert that these complaints diminished the fair market value of the leases.
 
 
 44
 Based on our review of the record, we cannot hold that the exclusion of this evidence was an abuse of discretion on the part of the district court. The district court allowed evidence concerning the bankruptcy and its effect on the value of the leases. The district court recognized that while value "is very well dependent upon the status of the Telemark proceedings being in bankruptcy. It is not dependent upon the cloud on the title of the lienholders." Allison Record at 448. Ticor claims the adversary complaints should have been admitted to show the risk a willing buyer would be taking in purchasing a unit in the fall of 1985 because of the threat of the two lawsuits in bankruptcy court. But at trial the district court ruled that the complaints instead were related to the title defect issue and the cause of the loss of the units; any relevance to the documents concerning the condition and possible future of the lease was outweighed by their potential to mislead and confuse the jury. This court has recognized that "the trial court's balancing of probative value and unfair prejudice is highly discretionary and its decision on admissibility will be accorded 'great deference.' " Geitz v. Lindsey, 893 F.2d 148, 150 (7th Cir.1990) (citation omitted). There was no substantial prejudice to Ticor because the district court did permit evidence concerning the condition of the lodge and the fact that Telemark was in bankruptcy proceedings. Furthermore, we find no basis for Ticor's assertion that the district court ruled inconsistently on the admissibility of the Kaiser complaints.
 
 
 45
 With respect to other documents about the Purchase Agreement, the bankruptcy sale, and the distribution of proceeds, we do not understand Ticor's contention that they should have been admitted to show the proper formula for dividing proceeds from any sale. At trial, Ticor offered these exhibits as part of its theory that a willing buyer and seller should know the true condition of the lodge. The district court ruled that the facts of what occurred could be admitted, and Ticor agreed that was all it wanted brought to the jury's attention. Arguments about how much the unitholders received from the sale and the calculations were not made concerning the admissibility of these exhibits. On appeal, we will not review different grounds of admissibility than were made at trial. See David W. Louisell & Christopher B. Muller, Federal Evidence § 13 (1977). The district court ruled that the documents were not relevant in their entirety, and we will not reverse the district court in the absence of a clear abuse of discretion. See New Burnham Prairie Homes, Inc. v. Village of Burnham, 910 F.2d 1474, 1482 (7th Cir.1990).
 
 3. The income approach to valuation
 
 46
 The most serious of the defendant's several arguments for a new trial on damages is that the district court erroneously admitted evidence about the income approach to valuation for determining the fair market value of the leases. The Wisconsin method for determining fair market value considers what the property would sell for in an open market between a willing buyer and seller. Rosen v. City of Milwaukee, 72 Wis.2d 653, 242 N.W.2d 681, 684 (1976). "The 'best information' of such value is a sale of the property or if there has been no such sale then sales of reasonably comparable property." Id. 242 N.W.2d at 685. A trial judge's determination of the acceptability of sales as comparables for the admission of evidence is a discretionary issue which should not be reversed unless it was clear error. Leathem Smith Lodge v. State of Wisconsin, 94 Wis.2d 406, 288 N.W.2d 808, 812-13 (1980). It is then, of course, a question for the jury to decide what weight to give comparable sales evidence according to how similar or dissimilar the sales are to the property at issue. Weeden v. City of Beloit, 29 Wis.2d 662, 139 N.W.2d 616, 619 (1966). When there are no comparable sales, other reliable factors may be considered including costs, depreciation, replacement value, and income. See Rosen, 242 N.W.2d at 685. But the law is clear in Wisconsin that when comparable sales evidence is available, income evidence should not be admitted. Leathem Smith Lodge, 288 N.W.2d at 812; Mancheski v. State of Wis., 49 Wis.2d 46, 181 N.W.2d 420, 422 (1970). Income evidence is generally considered too speculative as it depends upon too many contingencies to be reliable for determining fair market value. Id. 181 N.W.2d at 423.
 
 
 47
 The district court was perfectly aware of Wisconsin's law on determining fair market value and throughout the course of the trial questioned the existence of acceptable comparable sales and their effect on the use of income evidence. In discussions about the use of the plaintiffs' proposed jury instruction on capitalization of rental income, the district judge said several times that he must wait to learn whether reliable evidence of comparable sales would be presented at trial. The judge reserved ruling on the instruction until after the defendant's expert witness testified. At the close of defendant's evidence, the district court ruled that it would not give the capitalization of rental income instruction because of the credible evidence presented of comparable sales.
 
 
 48
 Ticor objects to the admission of testimony by plaintiffs' expert witnesses evaluating the units' fair market value according to the income approach. Despite Ticor's objections to plaintiffs' jury instruction on income valuation, Ticor did not object at trial or move to strike testimony as it related to income valuation. Ticor first contends that objections made in its motions in limine obviated the need to make contemporaneous objections at trial. See Harris v. Davis, 874 F.2d 461, 464 n. 5 (7th Cir.1989), cert. denied, 493 U.S. 1027, 110 S.Ct. 735, 107 L.Ed.2d 754 (1990); Thronson v. Meisels, 800 F.2d 136, 142 (7th Cir.1986). While the law in this circuit is that an unsuccessful motion in limine does preserve the issue for appeal, nowhere in its motions in limine does Ticor object to the income valuation evidence. Instead, on the day of trial, Ticor submitted a trial brief concerning the proper method to determine fair market value under Wisconsin law. In this trial brief, which Ticor stated was not a motion in limine, Ticor objected to any improper use of income analysis. A motion in limine is sufficiently distinguishable from a trial brief submitted on the day of trial. See 1 McCormick on Evidence § 52 (4th ed. 1992). Ticor then contends in its brief on appeal that it did move to strike the income testimony during the trial. While Ticor did move to strike the witness Daniel Scouler's testimony because it was not in conformance with Wisconsin standards governing proof of fair market value, that witness admitted on cross-examination that he was not testifying as to the fair market value. Instead that witness was testifying as to whether or not the bankruptcy had any impact on the unitholders' value. Ticor did not move to strike any other witness' testimony, even after the district court's invitation to do so at the close of evidence.
 
 
 49
 We believe that Ticor should have preserved any objections to the income evidence by renewing any previous objections or by moving to strike any testimony concerning that method of valuation after the district court's ruling on the income jury instruction. See id. It is unclear from the record whether the income evidence was admitted subject to "connecting up," or whether it was provisionally admitted subject to the later ruling on the comparable sales. But in either situation, Ticor cannot imperfectly guard its rights in hopes that the inadmissible testimony will provide a basis for reversal on appellate review. See United States v. Dougherty, 895 F.2d 399, 404 (7th Cir.), cert. denied, 497 U.S. 1008, 110 S.Ct. 3249, 111 L.Ed.2d 759 (1990). Perhaps, as the district court noted, the fact that the income method provided the least value of the various methods presented by one of plaintiffs' expert witnesses weighed in Ticor's trial strategy. Memorandum and Order, Jan. 24, 1991 at 14. Certainly Ticor itself presented evidence relying upon the income approach to valuation through its own expert witness on fair market value.
 
 
 50
 Ticor is not entitled to a new trial because of any improper admission of income evidence. The jury's verdict is clearly supported by other evidence that the fair market value of the leases was $24,000. Moreover the jury instructions accurately reflected the law concerning fair market value. No instruction was given relating to the income approach, and the instructions did properly refer to using replacement costs and comparable sales as aids in determining the units' fair market value. We assume that the jury instructions were correct and reflected the proper legal standard. Coulter v. Vitale, 882 F.2d 1286, 1290 (7th Cir.1989); Will v. Comprehensive Accounting Corp., 776 F.2d 665, 675 (7th Cir.1985), cert. denied, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986).
 
 Prejudgment Interest
 
 51
 We turn now to plaintiffs' cross appeal of the district court's denial of prejudgment interest under Wis.Stat. § 628.46. Plaintiffs requested prejudgment interest in their separate complaints as well as in various motions and memoranda throughout this litigation. Ticor's contention that they have waived any claim under Wis.Stat. § 628.46 is unfounded. The district court denied plaintiffs' motion for an amended judgment after the joint damages trial which asserted that they were entitled to interest under Wis.Stat. § 628.46. The district court held that title insurers were exempt from that section. We disagree with the district court's interpretation of the statute and reverse the district court's denial of prejudgment interest.[2]
 
 
 52
 In diversity cases, federal courts look to state law for the availability of prejudgment interest. Allen & O'Hara, Inc. v. Barrett Wrecking, Inc., 964 F.2d 694, 695 n. 5 (7th Cir.1992); Fort Howard Paper Co. v. Standard Havens, Inc., 901 F.2d 1373, 1383 (7th Cir.1990). Prejudgment interest generally is considered compensation for the time value of money and a means of preventing defendants from prolonging litigation and benefitting from the delay. General Motors Corp. v. Devex Corp., 461 U.S. 648, 655 n. 10, 103 S.Ct. 2058, 2062 n. 10, 76 L.Ed.2d 211 (1983); In re Oil Spill by the Amoco Cadiz, 954 F.2d 1279 (7th Cir.1992); Williamson v. Handy Button Mach. Co., 817 F.2d 1290, 1297 (7th Cir.1987); Anderson v. State of Wis. Labor and Ind. Review Comm'n, 330 N.W.2d 594, 601 (Wis.1983); Nelson v. Travelers Ins. Co., 102 Wis.2d 159, 306 N.W.2d 71, 75-76 (1981). Unfortunately there is no Wisconsin case directly on point with the question of the application of Wis.Stat. § 628.46 to title insurers and little guidance on the statute's application to other insurers generally. We are mindful of the Wisconsin Supreme Court's remarks in Nelson when it observed:
 
 
 53
 The question of interest is one much more often passed upon than carefully considered by courts. It is usually presented only incidentally to much more important issues, and often decided one way or the other at the close of exhaustive investigation of the other questions, and with the perhaps unconscious feeling that it is not of sufficient magnitude to justify further serious labor. Again, the elements involved in determining the question are many of them so elastic in their application that cases may be rightfully resolved in different ways without the distinction being apparent from the statement of them.
 
 
 54
 Nelson, 306 N.W.2d at 75 (quoting Laycock v. Parker, 103 Wis. 161, 79 N.W. 327 (1899)). But with these reservations behind us, we turn to the issue at hand.
 
 
 55
 Wisconsin Statute section 628.46(1) provides that an insurer promptly pay every insurance claim. A claim is overdue if not paid within thirty days after the insurer has received written notice of the loss and the amount of the loss. All overdue payments collect simple interest at the rate of 12% per year. Section 628.46(3) states that this section only applies to the classes of claims enumerated in section 646.31(2). Section 646.31(2) states the classes of claims to be paid are residents, certain nonresidents, owners of property interests, third party claimants, and assignees. Chapter 646 deals specifically with the state's Insurance Security Fund which protects persons whose insurers go into liquidation. Chapter 628, however, defines general provisions for insurance marketing within the state. Certain insurers are exempt from the scope of chapter 646, including, among others, title insurers, in section 646.01(1)(b).
 
 
 56
 Plaintiffs contend that the district court misinterpreted Wisconsin's insurance code and incorrectly incorporated section 646.01(1)(b) along with section 646.31(2). Plaintiffs argue that the Wisconsin Court of Appeals as well as the state's Office of the Commissioner of Insurance interpret section 628.46 to apply to all insurers. The state of Wisconsin submitted an amicus brief adopting the plaintiffs' position and urging this court to reverse the district court's decision limiting the classes of claims which are eligible for interest payments under section 628.46.
 
 
 57
 The effect of a statute's specific reference to another statute's section is as if that referenced section was actually written into the incorporating statute. Layton School of Art & Design v. Wisconsin Employment Relations Comm'n, 82 Wis.2d 324, 262 N.W.2d 218, 224 (1978). Section 628.46(3) specifically refers to the classes of claims enumerated in 646.31(2). Under Wisconsin law, a specific reference incorporates only the specific part of the law which has been cited. Union Cemetery v. City of Milwaukee, 13 Wis.2d 64, 108 N.W.2d 180, 182 (1961); George Williams College v. Williams Bay, 242 Wis. 311, 7 N.W.2d 891 (1943). A specific statutory reference does not incorporate the entire law on the subject. Id.
 
 
 58
 The district court held that section 646.01(1)(b) must also be incorporated into section 628.46(3), although that statute specifically refers only to section 646.31(2). There is no reason to incorporate that additional section when the legislature referred only to 646.31(2). The district court was persuaded by the language "No claim may be paid under this chapter ..." (emphasis added) found in 646.31(2). The court imposed the additional restriction that the claim must be one that could be paid under chapter 646. The 1979 comments to section 646.01 state that various kinds of insurance are excluded from the security fund because they cannot be dealt with in the same way as other insurance. Wis.Stat.Ann. § 646.01 (West Supp.1991). Therefore, it appears the reasons for excluding title insurers from chapter 646 have nothing to do with the purpose of requiring that interest be paid on overdue insurance claims. Additionally, when the predecessor statute to 628.46 was enacted in 1976 (section 636.10), it referenced the predecessor to 646.31(2) (section 646.11(2)) which did not contain the language "under this chapter." Instead the section stated "A claim shall not be paid unless it is." Wis.Stat. § 646.11(2) (1973). It seems, therefore, that the legislature's original intent was not to include the restrictions applicable to chapter 646.
 
 
 59
 We are further persuaded that section 628.46 applies to all insurers because of the Wisconsin Court of Appeals decision in Wisconsin Physicians Serv. Ins. Corp. v. Mitchell, 114 Wis.2d 338, 338 N.W.2d 326 (1983). Because the Wisconsin Supreme Court has not decided the issue before us, we can accept the intermediate court's decision as authoritatively stating the law if there is no good reason to believe that the supreme court would reject its decision. Tippecanoe Beverages, Inc. v. S.A. Aguila Brewing Co., 833 F.2d 633, 638-39 (7th Cir.1987); Williams, McCarthy, Kinley, Rudy & Picha v. Northwestern Nat'l Ins. Group, 750 F.2d 619, 624 (7th Cir.1984). In Wisconsin Physicians Service Insurance Corp., the court of appeals held 628.46 applied to service insurance corporations. Wisconsin Physician Serv. Ins. Corp., 338 N.W.2d at 330. The court stated that the legislature must have intended to require all insurance corporations to promptly pay all claims or pay 12% interest on overdue payments because of the statute's "all-inclusive first sentence." Id. The court found there were no exemptions from the statute except for those contained in the statute itself. Id. Wisconsin's Attorney General appeared on behalf of Wisconsin's Office of the Commissioner of Insurance in that case as well.
 
 
 60
 Wisconsin's Office of the Commissioner of Insurance, the state's office administering all laws regulating insurance, has consistently interpreted section 628.46 (and its predecessor) to apply to all types of insurance. The office does not exclude any insurer from the interest requirement because of section 646.01. This office has penalized insurance companies that did not pay interest on claims pursuant to section 628.46. Among those penalized insurance companies are service insurance companies that are exempted from the scope of chapter 646 by 646.01(1)(a). Similarly, in Wisconsin Physicians Service Insurance Corp., the insurance company was a service insurance corporation that was forced to comply with section 628.46. The Office of the Commissioner of Insurance interprets section 628.46 as the court of appeals does, to apply to all insurers.
 
 
 61
 This court gives deference to Wisconsin's executive branch's interpretation of section 628.46, particularly in light of the absence of direction by Wisconsin's judicial branch. See Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 233-34, 106 S.Ct. 2860, 2867-68, 92 L.Ed.2d 166 (1986); Huggins v. Isenbarger, 798 F.2d 203, 208-09 (per curiam) (Easterbrook, J., concurring). Wisconsin's Attorney General filed an amicus brief stating that because of "the language of sec. 628.46 and the principles of statutory interpretation, the statute's history, and the Office of the Commissioner of Insurance's consistent past interpretations," title insurers should not be excluded from the scope of the claims eligible for interest payments. We agree with the Attorney General's interpretation of section 628.46. Because of the court of appeals' decision in Wisconsin Physician Service Insurance Corp., the position taken by the state of Wisconsin, and our own statutory interpretation, we hold that section 628.46 does apply to title insurers.
 
 
 62
 The other requirements of section 628.46 have been satisfied, and plaintiffs are entitled to prejudgment interest under this statute. The statute requires that an insurer be furnished with "written notice of the fact of a covered loss and of the amount of the loss." Wis.Stat. § 628.46(1). Plaintiffs gave Ticor written notice of the loss of their interests in Telemark Lodge and the amount of the losses, the amount of their respective title insurance policies, on December 19, 1985. Ticor has not argued that it did not receive notice of the losses. Instead Ticor contends on appeal that it fits within the one exception to the statute, that "[a]ny payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment." Id. Ticor, however, never attempted to establish by reasonable proof that it was not responsible for the payment. The statute plainly reads that it is the insurer who must offer the proof that it is not responsible for payments. Because Ticor did not present this argument to the district court, we will not consider it on appeal. Libertyville Datsun Sales, Inc. v. Nissan Motor Corp., 776 F.2d 735, 737 (7th Cir.1985) (collecting cases).
 
 CONCLUSION
 
 63
 We affirm the district court's denial of Ticor's motions for a directed verdict, judgment notwithstanding verdict, and a new trial in the Cadwell liability trial. We also affirm the district court's denial of Ticor's motions for judgment notwithstanding verdict and a new trial in the joint damages trial. But we reverse the district court's denial of prejudgment interest under Wis.Stat. § 628.46 and remand the case for the determination of 12% simple interest due on plaintiffs' awards. Plaintiffs shall recover the fair market value of their units as calculated by the district court in the joint damages trial. The jury determined that fair market value was $24,000. We believe that the actual loss of the plaintiffs is the fair market value of their interests in the fall of 1985 and not the purchase price of their interests in 1972. We decline to reconsider the measurement of damages established by this court in Allison v. Ticor Title Insurance Co. Costs shall be assessed against Ticor.
 
 
 64
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 We deny plaintiffs' motion to strike selected portions of appellant's brief. Defendants have sufficiently preserved the judicial estoppel argument for appeal
 
 
 [2]
 Accordingly, we deny plaintiffs' motion to certify the question of the scope of Wisconsin Statute section 628.46 to the Wisconsin Supreme Court