Cheryl NUNLEY, Plaintiff,

v.

**Ralph A. KLOEHN, M.D., Defendant.**

No. 93–C–343.

United States District Court,
E.D. Wisconsin.

June 19, 1995.

See also, 158 F.R.D. 614.

---

William M. Powell, Cape Coral, FL, for plaintiff.

Michael J. Pfau, Jeffrey R. Munson, Hinshaw & Culbertson, Milwaukee, WI, for defendant.

## DECISION AND ORDER

WARREN, District Judge.

Before the Court are the defendant's Motion for Judgment as a Matter of Law or Alternative Motion for a New Trial pursuant

to Federal Rules of Civil Procedure 50(b) ("Rule 50(b)")[1] and 59(a) ("Rule 59(a)") in the above-captioned matter. For the following reasons, both motions are denied.

## I. BACKGROUND

Plaintiff Cheryl Nunley, a Florida resident, filed the instant Complaint on April 8, 1993, amended on August 11, 1994, charging defendant Ralph A. Kloehn, M.D., a cosmetic and plastic surgeon residing in Wisconsin, with "reckless, careless, and negligent" performance of several lip augmentation and corrective surgeries involving the experimental substance Bioplastique which caused her "permanent scarring and disfigurement"; in his Answer of August 25, 1994, Dr. Kloehn denied any wrongdoing and filed seven affirmative defenses. After the Court addressed several pretrial motions, a jury trial commenced on April 10, 1995; on April 18, 1995, the jury returned with a verdict, finding Dr. Kloehn liable for medical malpractice and awarding Ms. Nunley $200,000 for past and future pain, suffering, and disability and $30,000 for future medical expenses.

## II. STANDARD OF REVIEW

### A. Renewed Motion for Judgment as a Matter of Law:

In diversity cases, federal courts apply the rules of the forum state in determining the propriety of post-verdict motions for judgment. *Jackson v. Bunge Corp.*, 40 F.3d 239, 242 (7th Cir.1994); *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 297 (7th Cir.1990); *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1548–49 (7th Cir.1990). Section 805.14 of the Wisconsin Statutes, like Federal Rule of Civil Procedure 50(b), allows a party to renew a motion for judgment as a matter of law, which it calls a motion for directed verdict, after a case has been submitted to the jury. Specifically, it provides that:

"A party who has made a motion for directed verdict or dismissal on which the court has not ruled pending return of the verdict may renew the motion after ver-

dict. In the event the motion is granted, the court may enter judgment in accordance with the motion."

*Wis.Stat.* § 805.14(5)(d). Because Wisconsin law only allows a Motion for Dismissal, and not a Motion for Directed Verdict, to be made by a defendant at the close of the plaintiff's case, *see Wis.Stat.* § 805.14(3), a Renewed Motion for Directed Verdict, like a Renewed Motion for Judgment as a Matter of Law brought under Rule 50(b), must by definition have been preceded by a similar motion made at the close of all the evidence. *See Wis.Stat.* § 805.14(4). Presumably, this also means that a Renewed Motion for Directed Verdict can only be granted on the grounds already advanced in the pre-verdict Motion for Directed Verdict, which in turn may only be brought to challenge the sufficiency of the evidence. *See Wis.Stat.* § 805.14(4).

The legal standard to be applied, then, is precisely the same under either type of directed verdict motion, and is summarized under Wisconsin law as follows:

"[n]o motions challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party."

*Wis.Stat.* § 805.14(1). "Under Wisconsin law, a directed verdict is permissible only when the evidence is 'so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion.'" *Pincus*, 893 F.2d at 1549 (*quoting Kozlowski v. John E. Smith's Sons Co.*, 87 Wis.2d 882, 275 N.W.2d 915, 918–19 (1979)). Stated another way:

"In Wisconsin, the standard for a directed verdict is this: taking that view of the evidence which is most favorable to the party against whom the verdict was sought to be directed, if there is any evidence

1. Because this is a diversity case, the defendant's Rule 50(b) motion is technically brought as a either a Renewed Motion for Directed Verdict

under Wis.Stat. § 805.14(5)(d) or a Motion for Judgment Notwithstanding the Verdict under *Wis.Stat.* § 805.14(5)(b). *See infra* Section II.

other than mere conjecture or incredible evidence to support a contrary verdict, the case must go to the jury."

*Delvaux v. Ford Motor Co.*, 764 F.2d 469, 473 (7th Cir.1985) (*quoting Samson v. Riesing*, 62 Wis.2d 698, 215 N.W.2d 662, 666 (1974)). *Accord Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1193 (7th Cir.1992) (noting that "if there is any evidence which supports the nonmoving party's cause of action, then the motion [is] correctly denied") (citing *Wisconsin Natural Gas Co. v. Ford, Bacon & Davis Constr. Co.*, 96 Wis.2d 314, 291 N.W.2d 825, 836 (1980)); *Sievert v. American Family Mut. Ins. Co.*, 180 Wis.2d 426, 509 N.W.2d 75, 79 (Ct.App.1993), *aff'd on other grounds*, 190 Wis.2d 623, 528 N.W.2d 413 (1995) (such motions are only to be granted if "no credible evidence supports" the verdict).

■ Section 805.14 of the Wisconsin Statutes also provides a second vehicle for bringing a post-verdict motion. Specifically, it states that:

"A party against whom a verdict has been rendered may move the court for judgment notwithstanding the verdict in the event that the verdict is proper but, for reasons evident in the record which bear upon matters not included in the verdict, the movant should have judgment."

*Wis.Stat.* § 805.14(5)(b). Unlike a Renewed Motion for a Directed Verdict brought under § 805.14(5)(d), "[i]t is not necessary to move for a directed verdict or dismissal prior to submission of the case to the jury in order to move subsequently for a judgment notwithstanding the verdict." *Wis.Stat.* § 805.14(5)(e). And unlike a directed verdict motion, a Motion for Judgment Notwithstanding the Verdict is not designed to challenge the admissibility of evidence nor its sufficiency to support the verdict; rather, "[t]he motion admits for the purposes of the motion that the findings of the verdict are true, but asserts that judgment should be granted on grounds other than those decided by the jury." *Allison*, 979 F.2d at 1195. *Accord Kolpin v. Pioneer Power & Light Co., Inc.*, 162 Wis.2d 1, 469 N.W.2d 595 (1991); *Chevron Chemical Co. v. Deloitte & Touche*, 168 Wis.2d 323, 483 N.W.2d 314 (Ct.App.

1992). As in the case of a Renewed Motion for Directed Verdict,

"[a] motion for JNOV must be denied if after viewing the evidence in the light most favorable to the nonmoving party, reasonable people could fairly reach different conclusions. In applying this standard, [a court should] not evaluate the credibility of the witnesses or otherwise consider the weight of the evidence."

*Allison*, 979 F.2d at 1196 (citations omitted).

## B. Motion for a New Trial:

■ Federal Rule of Civil Procedure 59(a) ("Rule 59(a)") authorizes the Court to grant a new trial at the request of a party in both jury and court settings "for any of the reasons for which new trials [or rehearings] have heretofore been granted in actions at law [or in suits in equity] in the courts of the United States." Irrespective of whether a federal court is exercising federal question or diversity jurisdiction, its standard of review in deciding a new trial request must be based on federal law. *Jackson*, 40 F.3d at 244; *Allison*, 979 F.2d at 1196.

[6] Under federal law, a Motion for a New Trial is addressed to the sound discretion of the trial judge. *Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1377 (7th Cir.1990). The Seventh Circuit has recognized that a new trial may be granted in three instances: "(1) the verdict is against the clear weight of the evidence; (2) the damages are excessive; or (3) the trial was unfair to the moving party." *Allison*, 979 F.2d at 1196; *Cygnar v. City of Chicago*, 865 F.2d 827, 835 (7th Cir.1989). *Accord Thomas v. United States*, 41 F.3d 1109, 1120 (7th Cir.1994); *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 758 (7th Cir.1994); *Sokol Crystal Prods., Inc. v. DSC Comms. Corp.*, 15 F.3d 1427, 1432 (7th Cir.1994). A Rule 59(a) motion "is not merely intended to secure a forum for the relitigation of old matters or to afford the parties the opportunity to present the case under new theories; instead, the motion is a device properly used to correct manifest errors of law or fact or to present newly discovered evidence." *Fort Howard*, 901 F.2d at 1380 n. 4. The Seventh Circuit has articulat-

ed the legal standard for addressing a new trial motion as follows:

"In reviewing a motion for a new trial, we view the evidence in the light most favorable to the prevailing party. We will not set aside the jury's verdict if there is a reasonable basis in the record which supports that verdict."

*Thomas*, 41 F.3d at 1120 (*quoting Allison*, 979 F.2d at 1196). The trial court is not permitted to substitute its judgment for that of the jury on disputed issues of fact. *Hibma v. Odegaard*, 769 F.2d 1147, 1154 (7th Cir.1985).

Under Rule 59(b), "[a] motion for a new trial shall be served not later than 10 days after the entry of the judgment." A district court may not extend the time for filing a new trial motion. *Varhol v. National R.R. Passenger Corp.*, 909 F.2d 1557, 1561 (7th Cir.1990). Within that same time frame, "the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party." Federal Rule of Civil Procedure 59(d). Under Rule 50(b), a new trial motion "may be joined with a renewal of the motion for judgment as a matter of law, or a new trial may be requested in the alternative."

## III. *DISCUSSION*

### A. Parties' Arguments:

The defendant argues that he is entitled to a judgment notwithstanding the verdict or, alternatively, a new trial, for several reasons. First of all, he claims that Dr. Alkek, the plaintiff's only standard of care expert and a Board Certified dermatologist, was not qualified to render an opinion as to whether or not the defendant breached the standard of care because Dr. Alkek was only experienced in the use of liquid silicone and, while he had read articles on Bioplastique published after the plaintiff was treated, he had not been schooled in the use of Bioplastique. The defendant also claims that he is entitled to a new trial "because of the prejudicial and erroneous arguments of plaintiff's counsel," including his invitation to the jury during closing arguments to speculate that the defendant did not use Dr. Ersek, one of the

defendant's experts, as a standard of care witness because his testimony would support the plaintiff's case. Dr. Kloehn further argues that the Court should order a new trial because he was precluded from making a similar argument to the jury regarding Dr. Mandraccia, the plaintiff's damages expert, who the plaintiff decided not to use as a standard of care witness at trial.

The plaintiff responds that the Court did, in fact, allow defense counsel during closing arguments to invite the jury to speculate that the plaintiff did not use Dr. Larson or Dr. Mandraccia as standard of care witnesses because their testimony would not support her case, specifically noting that "what's sauce for the goose is sauce for the gander." She also argues that defense counsel's failure to bring a Motion for a New Trial after closing arguments and prior to the jury verdict constituted a waiver of any claim of improper argument by plaintiff's counsel. Finally, she claims that Dr. Alkek was qualified to testify as a standard of care expert in this case.

### B. Analysis:

#### 1. *Dr. Alkek's testimony:*

■ Dr. Alkek's competency to testify as a standard of care witness was addressed by the Court after the issue was raised by the defendant in a Motion in Limine. At that time, the Court held that his status as a dermatologist, rather than a plastic and reconstructive surgeon, did not automatically disqualify him from testifying as a standard of care witness because he had performed numerous lip augmentations and other procedures using silicone-based products. While the defendant continues to object to Dr. Alkek's competency to render a standard of care opinion based on his field of specialty and the fact that he never personally used Bioplastique, we remain convinced that his testimony was properly allowed.

■ The Seventh Circuit has stated that "[w]hether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testi-

mony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir.1990). The focus, then, is on the "fit" between the subject matter at issue and the expert's familiarity therewith, and not on a comparison of the expert's title or specialty with that of the defendant or a competing expert. It seems clear, for example, that both a podiatrist and a dermatologist could testify regarding the appropriate standard of care to be taken in treating a case of athlete's foot assuming that each possessed the degree of skill, knowledge, or experience in dealing with such ailment contemplated under Federal Rule of Evidence 702.[2] As noted by the Seventh Circuit:

> "The Federal Rules of Evidence have, it is true, liberalized the standards for qualifying expert witnesses. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 449–50, 102 L.Ed.2d 445 (1988). *No longer need they belong to some recognized professional community.* It is enough, to be qualified as an expert and thus entitled to give opinion testimony, that one has specialized knowledge that would assist the trier of fact. Fed.R.Evid. 702."

*Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir.1993). *Accord Crisostomo v. Stanley*, 857 F.2d 1146, 1153 n. 18 (7th Cir.1988) (noting that the testimony of a qualified medical doctor cannot be excluded simply because he is not a specialist in a particular school of medical practice). It is the acquiring of specialized knowledge regarding a matter at issue, and not the field of specialty, which determines the qualifications of an expert. Thus, as long as a dermatologist, plastic surgeon, reconstructive surgeon, or surgeon of any other specialty has become adequately familiar, through study and/or experience, with the techniques and effects of lip and other augmentations using silicone-based substances, he or she may, under appropriate circumstances, be qualified to testify as a standard of care expert regarding the use and application of closely-related products.

In this case, we believe that Dr. Alkek, through his own experience and study in using silicone-based products for lip augmentation procedures, possessed specialized knowledge, skill, and expertise which the jury may have found helpful. It is not disputed that Dr. Alkek had performed numerous lip augmentations and other procedures using liquid silicone. Contrary to the argument posed by the defendant, this gave him ample experience with the formation of scar tissue around silicone to render an opinion as to the optimal volume and depth of silicone injections which may have assisted the jury in reaching its conclusions. The defendant correctly indicates that Bioplastique, which consists of microscopic "balls" of silicone suspended in "bio-degradable" gel, is not the same as liquid silicone; however, in the case of both substances, the desired result is augmentation through the formation of scar tissue which encapsulates the injected substance. The defendant analogizes the differences between liquid silicone and Bioplastique to that of water and ice cubes; the latter, however, also share many similar qualities, and are comprised of precisely the same elements. Depending on the circumstances, the similarities often times clearly outweigh the differences, and specialized information acquired as to one is certainly transferrable to the other.

This is one such case. In our view, the techniques and effects involved in the performance of lip augmentations using liquid silicone and Bioplastique are not so inherently foreign that a doctor schooled in the former could not be found qualified to render an expert opinion as to the standard of care in using Bioplastique unless he had actually used the substance himself. In effect, Dr. Kloehn asks us to conclude that only he and the other ten "approved investigators" who participated in the Bioplastique experimental protocol can qualify as standard of care experts in this case; such a finding, however, would unduly "hypersplice" the field of silicone-based augmentation procedures as well as unfairly limit potential experts to doctors

---

**2.** Rule 702 states that, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

who, like the defendant, have a vested interest against seeing a liability finding in this case. During cross-examination, the defendant aggressively attacked Dr. Alkek's opinion based, *inter alia,* on his field of specialty, lack of hands-on experience in using Bioplastique, and reliance on post-treatment articles. These matters fell four-square within the realm of credibility issues to be decided by the jury; they did not, however, *a fortiori* disqualify Dr. Alkek from rendering standard of care opinions at trial. The transferability of medical knowledge is certainly dependant on experience, and we agree that a doctor who has performed only a limited number of lip augmentations using liquid silicone may not be qualified to pass judgment at trial on the slightly different, albeit related, techniques involving Bioplastique. We are satisfied, however, that Dr. Alkek was adequately schooled and experienced in the field of silicone-based lip augmentations to render a qualified opinion in this case.

It is impossible for the Court to surmise all the factors relied upon by the jury in concluding that Dr. Kloehn negligently performed these procedures; however, we cannot say that the jury acted unreasonably in favoring the opinion of Dr. Alkek over that of Dr. Allen and Dr. Goldstein. For this reason, the defendant's request for judgment notwithstanding the verdict must be denied.

### 2. *Comments made during closing arguments:*

Prior to trial, defense attorneys Michael Pfau and Jeffrey Munson designated Dr. Allen, Dr. Ersek, and Dr. Goldstein as expert witnesses regarding the standard of care applicable in this case; Dr. Allen and Dr. Ersek were to testify in person, and Dr. Goldstein would appear on videotape. In one of several motions in limine brought at the onset of trial, plaintiff's counsel, William Powell, requested that the Court preclude the defendant from calling all three doctors to testify on the issue of standard of care, arguing that such action would be duplicative and cumulative. We denied the plaintiff's motion, although we reserved the right to revisit the issue as the evidence developed.

Dr. Allen was the first of the three doctors to appear, having been called out-of-order during the plaintiff's case, and Dr. Goldstein's videotaped testimony was played at the end of the defendant's case; both testified on the issue of standard of care. Dr. Ersek was the first witness called by the defendant after the plaintiff rested her case, and testified before Dr. Goldstein and after Dr. Allen; on cross-examination by Mr. Powell, the following colloquy ensued:

"Q: Would you agree that if a doctor intended to do an overcorrection, that would be a breach of the standard of care?

MR. PFAU: Objection, your honor. I did not go into standard of care with this witness. Outside the scope. We merely talked about Bioplastique. I never asked him any questions with respect to standard of care.

MR. POWELL: He's not a standard of care witness.

MR. PFAU: That's right. I didn't offer him as that.

THE COURT: I don't recall any questions that would make that within the scope. Sustained.

MR. POWELL: Okay.

Q: So you have no opinion on the standard of care, Doctor?

MR. PFAU: Wait a minute. I object to the form of the question.

MR. POWELL: I think that's what he said. I want to get it clear from the witness, Judge.

THE COURT: No, the objection was sustained, merely on a scope issue. That doesn't mean he doesn't have any opinions.

MR. POWELL: He's not here to give an opinion. Should I rephrase? You are not here to give an opinion on the standard of care of Dr. Kloehn?

THE WITNESS: I don't know.

THE COURT: That's controlled by the questioner, you see. The questioner is the one that sets the scope.

Q: You haven't given an opinion on the standard of care of Dr. Kloehn today?

A: I don't recall."

(Trial Transcript, 4/14/95, Dr. Ersek's testimony, pages 90–91.) On redirect by Mr. Pfau, Dr. Ersek testified as follows:

"Q: Doctor, Mr. Powell asked you about Dr. Kloehn putting in more Bioplastique. In your review of the doctor's medical records, did Dr. Kloehn put more Bioplastique on top of the Bioplastique he originally injected?

MR. POWELL: Same objection. Standard of care. Outside the scope. This is not a standard of care witness.

MR. PFAU: But you asked him that.

THE COURT: You did ask him that very question, didn't you?

MR. PFAU: Yes.

MR. POWELL: Until we found out it wasn't a standard of care witness, Judge.

THE COURT: Did I keep the answer out?

MR. PFAU: No, you didn't.

THE COURT: All right. Then let it go. Let the answer go.

A: As I recall from reviewing the charts, that there were some areas where there was not enough material according to the patient's wishes, and some areas where there seemed to be too much. So he took some out where there was too much and added some where there was too little. I think that's reasonable."

(*Id.* at 97.)

From this, it is clear that Dr. Ersek was not called nor asked to testify as a standard of care witness by the defendant. While Mr. Powell may have been permitted to ask Dr. Ersek whether or not he had an opinion regarding the issue of standard of care absent a relevancy objection by the defendant, he clearly understood that he was not permitted to ask Dr. Ersek what that opinion was. Mr. Pfau, in turn, did not request that Dr. Ersek render such an opinion; Dr. Ersek's commentary that he thought that the defendant's removal and additional injection of Bioplastique was "reasonable" was not responsive to Mr. Pfau's question and could have been stricken had Mr. Powell so requested.

During his closing argument, Mr. Powell mentioned Dr. Ersek:

"MR. POWELL: "The last thing we have here that I want to talk about before I get into some of the claims that the defense is going to make about how Cheryl was negligent is I want to talk about Dr. Ersek. Dr. Ersek was a—is a very accomplished physician. He's got a resume that's 30 pages long. Dr. Ersek was the inventor of this product. Aside from the fact that Ersek told us that Cheryl's lips could win a beauty contest, told us that her lips would make Kim Basinger envious—aside from those issues, one thing we found—that I found was interesting was that when I asked him to a reasonable degree of medical probability if an overcorrection was achieved on the first injection in June, should Dr. Kloehn have injected more of this product the next time in October. And the defense said objection, he's not a standard of care witness. The inventor of the product has been called by the defense. He's got articles on how much of this stuff to inject. He's proclaimed as the expert inventing it, but he's not allowed to tell us what Dr. Kloehn did.

MR. PFAU: Object, your Honor. The court sustained the objection, and he's asking them to infer—

MR. POWELL: No, I'm not.

MR. PFAU: Wait a minute. Infer on evidence. That's not—

THE COURT: Wait a minute. Let's go over here."

(Trial Transcript, 4/17/95, pp. 18–19.) After a brief sidebar, Mr. Powell continued:

"MR. POWELL: As I was saying, I asked that standard of care question. I said what if Dr. Kloehn had achieved an overcorrection in June of 1990; would it be counter-indicated? Do you have an opinion as to a reasonable degree of medical probability et cetera et cetera and we pulled an objection from the defense and they said no, no, no he's not a standard of care witness. *Dr. Ersek, the inventor of the product, who's supposedly lectured on how to do this stuff, is not going to tell us if Dr. Kloehn did it right.*

I mean they brought him all the way down here from Texas and he has this tremendous resume and he's taught all these people on how to do it and he's taught by lecturing how to do it and he's told us all about all the other inventions he's made

and how Bioplastique was studied and he thought it would be successful; *but when asked to comment on the standard of care, Dr. Kloehn's conduct in Cheryl's case, they wouldn't let us get that answer. And I just want the jury to ask that question. Why is it that Dr. Kloehn, that doctor who invented this product, wasn't allowed to testify on his standard of care? ...*"
(*Id.* at 19–20) (emphasis added).

According to the defendant, while Dr. Ersek's deposition testimony indicated that he believed that Dr. Kloehn did not breach the standard of care,[3] Dr. Ersek was not called as a standard of care witness because his testimony was not necessary and, with Dr. Goldstein later to be presented as a standard of care expert, may have been cumulative. As a result, the defendant argues that, not only was Mr. Powell's implication to the jury improper, but, unbeknownst to the Court at the time of closing arguments, his "suggestion that Dr. Ersek was critical of Dr. Kloehn was patently false, *and Attorney Powell knew it!*"

■ While the Court can certainly appreciate the defendant's concerns, and is outraged by Mr. Powell's apparent willingness to attempt to deceive the Court and the jury, we do not believe that the jury was left with a material misimpression warranting a new trial. As an initial matter, we note that this was but one of a long line of disputes between Mr. Powell and Mr. Pfau aired, at least in part, before the jury. The record is replete with objections made by each attorney to questions asked and tactics employed by opposing counsel from the time of opening statements through the completion of closing arguments. For the most part, the Court sustained the objections brought by Mr. Pfau while overruling those of Mr. Powell given Mr. Powell's tendency to phrase questions inappropriately and to, in effect, enter his

own testimony and comments (rather than that of witnesses) into the record. We noted on several occasions that this was sloppy procedure, and (without success) implored counsel to better adhere to the rules; as Mr. Powell's transgressions continued, Mr. Pfau's objections became more vociferous and combative. In one instance, Mr. Powell and Mr. Pfau physically fought over the notes of Dr. Alkek in front of the jury; in another, after Mr. Powell unsuccessfully and belatedly attempted to introduce into evidence a vial containing tissue taken from Ms. Nunley's lips, Mr. Pfau and Ms. Nunley took turns placing the vial within and outside of the view of the jury. Whether from lack of preparedness or lack of experience, Mr. Powell's performance during this trial was lacking and often times frustrating to the Court, and during the course of the trial the Court repeatedly found itself in the position of a parent chastising petulant children. There existed much acrimony between the attorneys, with much of it exhibited before the jury; as a result, by the time of closing arguments, the jury no doubt had become desensitized to side-bars, attorney quarrels, and other "breaks in the action."

In retrospect, especially knowing as we do now that Mr. Powell was aware that Dr. Ersek's standard of care testimony would not have been detrimental to the defendant's case, the Court likely would have prevented Mr. Powell from making the above-referenced argument to the jury; however, we do not believe that the failure to do so caused any unfairness to the defendant. First of all, the jury had been exposed to so many side-bars and objections that this incident clearly did not fall out of the ordinary or draw undue attention. Secondly, Mr. Pfau was allowed to rebut Mr. Powell's argument during his closing argument,[4] as well as to suggest to

---

**3.** The defendant references the following portions of Dr. Ersek's deposition transcript:

"Q: Okay. What other opinions do you have with respect to the material that you reviewed?

\* \* \* \* \* \*

THE WITNESS: I think Dr. Kloehn is a good doctor who did the right things with this experimental material.

Q: Okay. And why is that?

A: I think he cared for this patient and went out of his way to comply with her wishes

\* \* \* \* \* \*

THE WITNESS: Well, I have an opinion that I think Dr. Kloehn treated this patient in a proper and appropriate way."
(Deposition of Dr. Ersek, 8/6/94, pp. 43, 86.)

**4.** Assuming that Mr. Powell's statements were improper, this opportunity to rebut effectively

the jury that Dr. Mandraccia and Dr. Larson were not called as standard of care witnesses by the plaintiff because their testimony would have been detrimental to her case:

"MR. PFAU: *Plaintiff's attorney says why didn't you ask Dr. Ersek standard of care questions? Because if I'd asked standard of care questions? He would object that the testimony was cumulative* but he had before you Dr. Mandraccia, and

MR. POWELL: Judge, I don't believe that that is appropriate argumentative comment.

THE COURT: Gentlemen, you both are commenting on what the other should infer what's sauce for the goose is sauce for the gander."

MR. POWELL: Okay, Judge. Thank you.

THE COURT: Objection is noted; overruled.

MR. PFAU: *We had Dr. Larson, we had Dr. Mandraccia both board certified plastic and reconstructive surgeons. Not— Neither of them said that Dr. Kloehn was negligent; neither said that his conduct was below the acceptable standard of care. Neither commented on the informed consent ..."*

(*Id.* at 36–37) (emphasis added). And a few minutes later:

MR. PFAU: *Doctor—Mr. Powell never asked Dr. Larson: Was Dr. Kloehn negligent?*

MR. POWELL: *Object, Your Honor. Dr. Larson was never listed as a care witness. He was a fact witness.*

THE COURT: I couldn't hear you.

MR. POWELL: I object Your Honor because Dr. Larson was listed as a fact witness he was not listed as a standard of care witness and that is a misrepresentation to the Jury.

MR. PFAU: Any more?

MR. POWELL: You listed her as a standard of care witness.

MR. PFAU: No.

THE COURT: Well, what's the problem; what did you say?

MR. POWELL: He said I never asked Dr. Larson the standard of care question. How could I? He wasn't a standard of care witness; he was a fact witness that was listed on the interrogatories.

THE COURT: All right.

MR. PFAU: *Ladies and gentlemen, use your common sense if, in fact, Dr. Larson was critical of the defendant in this case, Mr. Powell would have listed him as a standard of care witness.*

MR. POWELL: That's not true.

THE COURT: *Well, it is true, ladies and gentlemen, that they did list their witnesses according to what they purportedly were going to testify, and I held them to that standard; so if they were for one purpose, then they didn't testify for another purpose."*

(*Id.* at 41–42) (emphasis added). Unlike Dr. Ersek and Dr. Mandraccia, Dr. Larson was not listed by anyone as a standard of care witness; nevertheless, after suggesting that Dr. Mandraccia was not used as a standard of care witness because his testimony would be harmful to the plaintiff, Mr. Pfau further instructed the jury to "use its common sense" in determining why Dr. Larson was not so listed. Defense counsel, in effect, took Mr. Powell's argument one step further; and while two wrongs don't necessarily make a right, it would be specious for the defendant to now argue, in light of his own statements, that he was innocently victimized by Mr. Powell's conduct.

The defendant also argues that, unlike the plaintiff, he has clean hands in approaching this issue because, contrary to the circumstances surrounding his witness, Dr. Ersek, "Dr. Mandraccia's testimony [at deposition] regarding the standard of care was not favorable to the plaintiff." He does not, however, cite any such testimony to support his claim. Moreover, even assuming that Dr. Mandraccia would have testified adversely to the plaintiff and that therefore Mr. Pfau's implication to the jury was correct, the Court

ensured that the fairness of the trial was not fundamentally flawed. *See, e.g., United States v.*

*Badger,* 983 F.2d 1443, 1455 (7th Cir.1993).

cannot see how this would prejudice the defendant; this would simply mean that Mr. Powell, unlike Mr. Pfau, would not have a basis for rebutting the inference to be drawn from the failure to call his own expert as a standard of care witness. And the record makes clear that Mr. Powell, in fact, did not attempt to rebut the inference sought by Mr. Pfau.

 Later in his closing argument, Mr. Pfau again discussed Dr. Mandraccia's testimony:

"MR. PFAU: You know, I'll just touch briefly about Dr. Mandraccia. He said there is nodularity; that she may benefit from some cosmetic augmentations to smooth out the contours of the lips. He admitted that no reputable plastic or reconstructive surgeon had used liquid silicon for 20 years and the corners of the mouth could be released by surgery. *Dr. Mandraccia was never asked if there was any additional information that Dr. Kloehn could share with the patient; he was never asked if Dr. Kloehn misrepresented a single fact to the plaintiff.*

MR. POWELL: Your Honor, Dr. Mandraccia was not a standard of care witness. He was called for damages and counsel knows that.

THE COURT: Was there an objection during his testimony that I sustained?

MR. PFAU: That is correct.

MR. POWELL: No, judge, we didn't call him for anything but damages.

MR. PFAU: You tried.

MR. POWELL: Judge, if this kind of—May we have a sidebar, judge?"

(*Id.* at 58–59) (emphasis added). Immediately after the sidebar, Mr. Pfau again rebutted Mr. Powell's implications regarding Dr. Ersek's failure to testify as a standard of care witness.[5] While it appears that the Court instructed Mr. Pfau to move on during the

sidebar, it is obvious that we neither sustained an objection (if, in fact, one was made) by Mr. Powell nor instructed the jury to disregard anything stated by Mr. Pfau. Furthermore, the record makes clear that Mr. Pfau was referring to the plaintiff's negligent misrepresentation claim, rather than her medical malpractice claim, which was ultimately rejected by the jury. Again, there exists no basis for concluding that the defendant was unfairly treated or is entitled to a new trial.

Later, during his rebuttal, Mr. Powell again raised the topic of Dr. Ersek:

"MR. POWELL: ... And when she came back, his remedy was not removal. His remedy was maybe I can fill those pockets in, and he put more of the same stuff in. That was his remedy.

And that was testified as counter-indicated *and that was the area that Dr. Ersek was pulled back by the defense and not allowed to testify.*

MR. PFAU: I object, Your Honor, that's not true.

THE COURT: *Golly, I'm not going to make a decision on that. The jury can make their own decision.*

MR. POWELL: The question specifically dealt with whether nodularity was present, if an overcorrection was present, whether or not it was counter-indicated to put more in. *And that's exactly what—when he said 'Don't answer the question', it's not a standard of care question ...*"

(*Id.* at 72–73) (emphasis added). Again, in an effort to treat both parties fairly and evenhandedly, we noted that the jury, assuming it was so permitted by the jury instructions, could draw its own inferences from the facts in evidence.

And even if any of the Court's above-referenced rulings were, in fact, erroneous, they were effectively "cured" by the instruc-

---

5. After the sidebar, Mr. Pfau proceeded:
 "MR. PFAU: How much time do I have, Your Honor?
 THE COURT: Eight minutes.
 MR. PFAU: Eight minutes.
 MR. PFAU: You heard Dr. Ersek—Counsel says I didn't call him as a standard of care witness. I called Dr. Ersek to tell you about the product, about the procedure and what it does and how it worked and what these doctors found afterwards. And you heard him testify that he is still following patients even though this has been a moratorium on the use of silicone."
 (*Id.* at 59.)

tions given to the jury. It has long been recognized that "[o]ur theory of trial relies upon the ability of a jury to follow instructions." *United States v. Neely*, 980 F.2d 1074, 1085 (7th Cir.1992) (*quoting United States v. L'Allier*, 838 F.2d 234, 242 (7th Cir.1988)). At the conclusion of this case, the Court instructed the jury, *inter alia*, that:

> "The evidence and arguments in this case have been completed, and I will now instruct you as to the law applicable to this case. It is your duty to follow all of the instructions.
>
> You must not question any rule of law stated by me in these instructions. Regardless of any opinion you may have as to what the law ought to be, you must base your verdict upon the law given by me.
>
> It is your duty to determine the facts from the evidence in this case. You are to apply the law given to you in these instructions to the facts and in this way decide the case.
>
> *The evidence in this case consists of the sworn testimony of the witnesses, the exhibits received in evidence, and stipulated, admitted, or judicially noticed facts.*
>
> A stipulation is an agreed statement of facts between the parties, and you should regard such statements as true.
>
> You are to disregard any evidence to which I sustained an objection or which I ordered stricken. Anything you may have seen or heard about this case outside the courtroom is not evidence and must be entirely disregarded. You should not be influenced by sympathy, prejudice, fear, or public opinion.
>
> *Opening statements of counsel are for the purpose of acquainting you in advance with the facts counsel expect the evidence to show. Closing arguments of counsel are for the purpose of discussing the evidence.*
>
> *Opening statements, closing arguments, and other statements of counsel should be disregarded to the extent they are not supported by the evidence.*
>
> *During the course of trial, it often becomes the duty of counsel to make objections and for me to rule on them in accordance with the law. The fact the counsel made objections should not influence you in any way.*
>
> *Upon allowing testimony or other evidence to be introduced over the objection of an attorney, the Court does not, unless expressly stated, indicate any opinion as to the weight or effect of such evidence. When, on the other hand, I have sustained an objection to a question addressed to a witness, you must disregard the question entirely and may draw no inference from the wording of it or speculate as to what the witness would have said if he or she had been permitted to answer any question.*"

(Civil Jury Instructions, pages 1–3) (emphasis added). The instructions, then, make clear that, not only was the jury not to speculate as to how Dr. Ersek would have answered standard of care questions to which the defendant objected, but was also expected to "disregard" Mr. Powell's closing argument "to the extent it was not supported by the evidence," which is defined as "the sworn testimony of the witnesses, the exhibits received in evidence, and stipulated, admitted, or judicially noticed facts." We must presume, then, that, to the extent that Mr. Powell's suggestion in closing argument that Dr. Ersek's standard of care testimony would have been harmful to the defendant was unsupported by the evidence, it was ignored by the jury.

The Seventh Circuit has long recognized "a distinction between what is permissible in an instruction, 'which has the weight of law,' and what is permissible in argument, 'which is only that.'" *United States v. Burton*, 724 F.2d 1283, 1293 (7th Cir.1984) (*quoting United States v. Mahone*, 537 F.2d 922, 927–28 (7th Cir.1976)). We remain convinced, then, that none of our rulings to which the defendant now objects were erroneous. *See, e.g., Walls v. Armour Pharmaceutical Co.*, 832 F.Supp. 1505, 1517 (M.D.Fla.1993) (finding that "it was perfectly proper for plaintiff's counsel to argue that defendant's principal medical witness was incorrect and biased and to emphasize that point by pointing out that defendant called no one else to corroborate that witness"). And even if they were, for-

mal jury instructions given prior to the jury retiring for deliberation have, in circumstances more serious than these, been found to have "cured" an improper closing argument. *See, e.g., United States v. Gonzalez,* 933 F.2d 417, 430–31 (7th Cir.1991) (prosecutor incorrectly stated that defendant had stolen a box containing 17 kilograms of cocaine); *Burton,* 724 F.2d at 1291–92 (prosecutor suggested in that missing witness would have appeared if he were prepared to testify on behalf of the defendant); *Walls,* 832 F.Supp. at 1517 (plaintiff's counsel's suggested that defendant had only called one medical witness because no others would collaborate his opinion).

The Court remains satisfied that no improper rulings were made during closing arguments and that, even if there were, they were effectively "cured" by the instructions given to the jury prior to deliberations. As a result, the defendant's new trial motion must be denied.

## IV. *SUMMARY*

For the foregoing reasons, **IT IS HEREBY ORDERED** that the defendant's Motion for Judgment as a Matter of Law or Alternative Motion for a New Trial pursuant to Rules 50(b) and 59(a) be **DENIED** in the above-captioned matter.

**SO ORDERED.**